509 U.S. 688 (1993)
UNITED STATES
v.
DIXON et al.
No. 91-1231.
United States Supreme Court.
Argued December 2, 1992.
Decided June 28, 1993.
CERTIORARI TO THE DISTRICT OF COLUMBIA COURT OF APPEALS
*689 *690 Scalia, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, in which Rehnquist, C. J., and O'Connor, Kennedy, and Thomas, JJ., joined, and an opinion with respect to Parts III and V, in which Kennedy, J., joined. Rehnquist, C. J., filed an opinion concurring in part and dissenting in part, in which O'Connor and Thomas, JJ., joined, post, p. 713. White, J., filed an opinion concurring in the judgment in part and dissenting in part, in which Stevens, J., joined, and in which Souter, J., joined as to Part I, post, p. 720. Blackmun, J., filed an opinion concurring in the judgment in part and dissenting in part, post, p. 741. Souter, J., filed an opinion concurring in the judgment in part and dissenting in part, in which Stevens, J., joined, post, p. 743.
Deputy Solicitor General Bryson argued the cause for the United States. With him on the briefs were Solicitor General Starr, Assistant Attorney General Mueller, James A. Feldman, and Deborah Watson. 
James W. Klein argued the cause for respondents. With him on the brief were Elizabeth G. Taylor and Rosemary Herbert.[*]
*691 Justice Scalia announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and IV, and an opinion with respect to Parts III and V, in which Justice Kennedy joins.
In both of these cases, respondents were tried for criminal contempt of court for violating court orders that prohibited them from engaging in conduct that was later the subject of a criminal prosecution. We consider whether the subsequent criminal prosecutions are barred by the Double Jeopardy Clause.

I
Respondent Alvin Dixon was arrested for second-degree murder and was released on bond. Consistent with the District of Columbia's bail law authorizing the judicial officer to impose any condition that "will reasonably assure the appearance of the person for trial or the safety of any other person or the community," D. C. Code Ann. § 23-1321(a) (1989), Dixon's release form specified that he was not to commit "any criminal offense," and warned that any violation of the conditions of release would subject him "to revocation of release, an order of detention, and prosecution for contempt of court." See D. C. Code Ann. § 23-1329(a) (1989) (authorizing those sanctions).
While awaiting trial, Dixon was arrested and indicted for possession of cocaine with intent to distribute, in violation of D. C. Code Ann. § 33-541(a)(1) (1988). The court issued an order requiring Dixon to show cause why he should not be held in contempt or have the terms of his pretrial release modified. At the show-cause hearing, four police officers testified to facts surrounding the alleged drug offense; Dixon's counsel cross-examined these witnesses and introduced other evidence. The court concluded that the Government had established "`beyond a reasonable doubt that [Dixon] was in possession of drugs and that those drugs were possessed with the intent to distribute.' " 598 A. 2d 724, 728 (D. C. 1991). The court therefore found Dixon guilty of *692 criminal contempt under § 23-1329(c), which allows contempt sanctions after expedited proceedings without a jury and "in accordance with principles applicable to proceedings for criminal contempt." For his contempt, Dixon was sentenced to 180 days in jail. § 23-1329(c) (maximum penalty of six months' imprisonment and $1,000 fine). He later moved to dismiss the cocaine indictment on double jeopardy grounds; the trial court granted the motion.
Respondent Michael Foster's route to this Court is similar. Based on Foster's alleged physical attacks upon her in the past, Foster's estranged wife Ana obtained a civil protection order (CPO) in Superior Court of the District of Columbia. See D. C. Code Ann. § 16-1005(c) (1989) (CPO may be issued upon a showing of good cause to believe that the subject "has committed or is threatening an intrafamily offense"). The order, to which Foster consented, required that he not "`molest, assault, or in any manner threaten or physically abuse' " Ana Foster; a separate order, not implicated here, sought to protect her mother. 598 A. 2d, at 725-726.
Over the course of eight months, Ana Foster filed three separate motions to have her husband held in contempt for numerous violations of the CPO. Of the 16 alleged episodes, the only charges relevant here are three separate instances of threats (on November 12, 1987, and March 26 and May 17, 1988) and two assaults (on November 6, 1987, and May 21, 1988), in the most serious of which Foster "threw [his wife] down basement stairs, kicking her body[,] . . .pushed her head into the floor causing head injuries, [and Ana Foster] lost consciousness." 598 A. 2d, at 726.
After issuing a notice of hearing and ordering Foster to appear, the court held a 3-day bench trial. Counsel for Ana Foster and her mother prosecuted the action; the United States was not represented at trial, although the United States Attorney was apparently aware of the action, as was the court aware of a separate grand jury proceeding on some of the alleged criminal conduct. As to the assault charges, *693 the court stated that Ana Foster would have "to prove as an element, first that there was a Civil Protection Order, and then [that] . . . the assault as defined by the criminal code, in fact occurred." Tr. in Nos. IF-630-87, IF-631-87 (Aug. 8, 1988), p. 367; accord, id., at 368. At the close of the plaintiffs' case, the court granted Foster's motion for acquittal on various counts, including the alleged threats on November 12 and May 17. Foster then took the stand and generally denied the allegations. The court found Foster guilty beyond a reasonable doubt of four counts of criminal contempt (three violations of Ana Foster's CPO, and one violation of the CPO obtained by her mother), including the November 6, 1987, and May 21, 1988, assaults, but acquitted him on other counts, including the March 26 alleged threats. He was sentenced to an aggregate 600 days' imprisonment. See § 16-1005(f) (authorizing contempt punishment); Super. Ct. of D. C. Intrafamily Rules 7(c), 12(e) (1987) (maximum punishment of six months' imprisonment and $300 fine).
The United States Attorney's Office later obtained an indictment charging Foster with simple assault on or about November 6, 1987 (Count I, violation of § 22-504); threatening to injure another on or about November 12, 1987, and March 26 and May 17, 1988 (Counts IIIV, violation of § 22 2307); and assault with intent to kill on or about May 21, 1988 (Count V, violation of § 22-501). App. 43-44. Ana Foster was the complainant in all counts; the first and last counts were based on the events for which Foster had been held in contempt, and the other three were based on the alleged events for which Foster was acquitted of contempt. Like Dixon, Foster filed a motion to dismiss, claiming a double jeopardy bar to all counts, and also collateral estoppel as to Counts IIIV. The trial court denied the double jeopardy claim and did not rule on the collateral-estoppel assertion.
The Government appealed the double jeopardy ruling in Dixon, and Foster appealed the trial court's denial of his motion. The District of Columbia Court of Appeals consolidated *694 the two cases, reheard them en banc, and, relying on our recent decision in Grady v. Corbin, 495 U. S. 508 (1990), ruled that both subsequent prosecutions were barred by the Double Jeopardy Clause. 598 A. 2d, at 725. In its petition for certiorari, the Government presented the sole question "[w]hether the Double Jeopardy Clause bars prosecution of a defendant on substantive criminal charges based upon the same conduct for which he previously has been held in criminal contempt of court." Pet. for Cert. I. We granted certiorari, 503 U. S. 1004 (1992).

II
To place these cases in context, one must understand that they are the consequence of a historically anomalous use of the contempt power. In both Dixon and Foster, a court issued an order directing a particular individual not to commit criminal offenses. (In Dixon's case, the court incorporated the entire criminal code; in Foster's case, the criminal offense of simple assault.) That could not have occurred at common law, or in the 19th-century American judicial system.
At common law, the criminal contempt power was confined to sanctions for conduct that interfered with the orderly administration of judicial proceedings. 4 W. Blackstone,
*695 The 1831 amendment of the Judiciary Act still would not have given rise to orders of the sort at issue here, however, since there was a long common-law tradition against judicial orders prohibiting violation of the law. Injunctions, for example, would not issue to forbid infringement of criminal or civil laws, in the absence of some separate injury to private interest. See, e. g., 3 Blackstone, supra, at *426, n. 1; J. High, Law of Injunctions § 23, pp. 15-17, and notes (1873) (citing English cases); C. Beach, Law of Injunctions §§ 58-59, pp. 71-73 (1895) (same). The interest protected by the criminal or civil prohibition was to be vindicated at lawand though equity might enjoin harmful acts that happened to violate civil or criminal law, it would not enjoin violation of civil or criminal law as such. See, e. g., Sparhawk v. Union Passenger R. Co., 54 Pa. St. 401, 422-424 (1867) (refusing to enjoin railroad's violation of Sunday closing law); Attorney General v. Utica Insurance Co., 2 Johns. Ch. 371, 378 (N. Y. 1817) (refusing to enjoin violation of banking statute).
It is not surprising, therefore, that the double jeopardy issue presented herewhether prosecution for criminal contempt based on violation of a criminal law incorporated into a court order bars a subsequent prosecution for the criminal offensedid not arise at common law, or even until quite recently in American cases. See generally Zitter, Contempt Finding as Precluding Substantive Criminal Charges Relating to Same Transaction, 26 A. L. R. 4th 950, 953-956 (1983). English and earlier American cases do report instances in which prosecution for criminal contempt of courtas originally understooddid not bar a subsequent prosecution for a criminal offense based on the same conduct. See, e. g., King v. Lord Ossulston, 2 Str. 1107, 93 Eng. Rep. 1063 (K. B. 1739); State v. Yancy, 4 N. C. 133 (1814). But those contempt prosecutions were for disruption of judicial process, in which the disruptive conduct happened also to be criminal.
The Double Jeopardy Clause, whose application to this new context we are called upon to consider, provides that no *696 person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U. S. Const., Amdt. 5. This protection applies both to successive punishments and to successive prosecutions for the same criminal offense. See North Carolina v. Pearce, 395 U. S. 711 (1969). It is well established that criminal contempt, at least the sort enforced through nonsummary proceedings, is "a crime in the ordinary sense." Bloom, supra, at 201. Accord, New Orleans v. Steamship Co., 20 Wall. 387, 392 (1874).
We have held that constitutional protections for criminal defendants other than the double jeopardy provision apply in nonsummary criminal contempt prosecutions just as they do in other criminal prosecutions. See, e. g., Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 444 (1911) (presumption of innocence, proof beyond a reasonable doubt, and guarantee against self-incrimination); Cooke v. United States, 267 U. S. 517, 537 (1925) (notice of charges, assistance of counsel, and right to present a defense); In re Oliver, 333 U. S. 257, 278 (1948) (public trial). We think it obvious, and today hold, that the protection of the Double Jeopardy Clause likewise attaches. Accord, Menna v. New York, 423 U. S. 61 (1975) (per curiam); Colombo v. New York, 405 U. S. 9 (1972) (per curiam). 
In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the "same-elements" test, the double jeopardy bar applies. See, e. g., Brown v. Ohio, 432 U. S. 161, 168-169 (1977); Blockburger v. United States, 284 U. S. 299, 304 (1932) (multiple punishment); Gavieres v. United States, 220 U. S. 338, 342 (1911) (successive prosecutions). The sameelements test, sometimes referred to as the "Blockburger " test, inquires whether each offense contains an element not contained in the other; if not, they are the "same offence" and double jeopardy bars additional punishment and successive prosecution. In a case such as Yancy, for example, in which *697 the contempt prosecution was for disruption of judicial business, the same-elements test would not bar subsequent prosecution for the criminal assault that was part of the disruption, because the contempt offense did not require the element of criminal conduct, and the criminal offense did not require the element of disrupting judicial business.[1]
We recently held in Grady that in addition to passing the Blockburger test, a subsequent prosecution must satisfy a "same-conduct" test to avoid the double jeopardy bar. The Grady test provides that, "if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted," a second prosecution may not be had. 495 U. S., at 510.

III

A
The first question before us today is whether Blockburger analysis permits subsequent prosecution in this new criminal contempt context, where judicial order has prohibited criminal act. If it does, we must then proceed to consider whether Grady also permits it. See Grady, supra, at 516.
We begin with Dixon. The statute applicable in Dixon's contempt prosecution provides that "[a] person who has been conditionally released . . . and who has violated a condition of release shall be subject to . . . prosecution for contempt of court." § 23-1329(a). Obviously, Dixon could not commit an "offence" under this provision until an order setting out conditions was issued. The statute by itself imposes no legal obligation on anyone. Dixon's cocaine possession, although an offense under D. C. Code Ann. § 33-541(a) (1988 and Supp. 1992), was not an offense under § 23-1329 until a *698 judge incorporated the statutory drug offense into his release order.
In this situation, in which the contempt sanction is imposed for violating the order through commission of the incorporated drug offense, the later attempt to prosecute Dixon for the drug offense resembles the situation that produced our judgment of double jeopardy in Harris v. Oklahoma, 433 U. S. 682 (1977) (per curiam). There we held that a subsequent prosecution for robbery with a firearm was barred by the Double Jeopardy Clause, because the defendant had already been tried for felony murder based on the same underlying felony. We have described our terse per curiam in Harris as standing for the proposition that, for double jeopardy purposes, "the crime generally described as felony murder" is not "a separate offense distinct from its various elements." Illinois v. Vitale, 447 U. S. 410, 420-421 (1980). Accord, Whalen v. United States, 445 U. S. 684, 694 (1980). So too here, the "crime" of violating a condition of release cannot be abstracted from the "element" of the violated condition. The Dixon court order incorporated the entire governing criminal code in the same manner as the Harris felony-murder statute incorporated the several enumerated felonies. Here, as in Harris, the underlying substantive criminal offense is "a species of lesser-included offense."[2]Vitale, supra, at 420. Accord, Whalen, supra. 
*699 To oppose this analysis, the Government can point only to dictum in In re Debs, 158 U. S. 564, 594, 599-600 (1895), which, to the extent it attempted to exclude certain nonsummary contempt prosecutions from various constitutional protections for criminal defendants, has been squarely rejected by cases such as Bloom, 391 U. S., at 208. The Government also relies upon In re Chapman, 166 U. S. 661 (1897), and Jurney v. MacCracken, 294 U. S. 125 (1935), which recognize Congress' power to punish as contempt the refusal of a witness to testify before it. But to say that Congress can punish such a refusal is not to say that a criminal court can punish the same refusal yet again. Neither case dealt with that issue, and Chapman specifically declined to address it, noting that successive prosecutions (before Congress for contemptuous refusal to testify and before a court for violation of a federal statute making such refusal a crime) were "improbable." 166 U. S., at 672.
Both the Government, Brief for United States 15-17, and Justice Blackmun, post, at 743, contend that the legal obligation in Dixon's case may serve "interests . . . fundamentally different" from the substantive criminal law, because it derives in part from the determination of a court rather than a determination of the legislature. That distinction seems questionable, since the court's power to establish conditions of release, and to punish their violation, was conferred by statute; the legislature was the ultimate source of both the criminal and the contempt prohibition. More importantly, however, the distinction is of no moment for purposes of the Double Jeopardy Clause, the text of which looks to whether the offenses are the same, not the interests that the offenses violate. And this Court stated long ago that criminal contempt, *700 at least in its nonsummary form, "is a crime in every fundamental respect." Bloom, supra, at 201; accord, e. g., Steamship Co., 20 Wall., at 392. Because Dixon's drug offense did not include any element not contained in his previous contempt offense, his subsequent prosecution violates the Double Jeopardy Clause.
The foregoing analysis obviously applies as well to Count I of the indictment against Foster, charging assault in violation of § 22-504, based on the same event that was the subject of his prior contempt conviction for violating the provision of the CPO forbidding him to commit simple assault under § 22-504.[3] The subsequent prosecution for assault fails the Blockburger test, and is barred.[4]

B
The remaining four counts in Foster, assault with intent to kill (Count V; § 22-501) and threats to injure or kidnap (Counts IIIV; § 22-2307), are not barred under Blockburger. As to Count V: Foster's conduct on May 21, 1988, was found to violate the Family Division's order that he not "molest, assault, or in any manner threaten or physically abuse" his wife. At the contempt hearing, the court stated that Ana *701 Foster's attorney, who prosecuted the contempt, would have to prove, first, knowledge of a CPO, and, second, a willful violation of one of its conditions, here simple assault as defined by the criminal code.[5] See, e. g., 598 A. 2d, at 727-728; In re Thompson, 454 A. 2d 1324, 1326 (D. C. 1982); accord, Parker v. United States, 373 A. 2d 906, 907 (D. C. 1977) (per curiam). On the basis of the same episode, Foster was then indicted for violation of § 22-501, which proscribes assault with intent to kill. Under governing law, that offense requires proof of specific intent to kill; simple assault does not.[6] See Logan v. United States, 483 A. 2d 664, 672-673 (D. C. 1984). Similarly, the contempt offense required proof of knowledge of the CPO, which assault with intent to kill does not. Applying the Blockburger elements test, the result is clear: These crimes were different offenses, and the subsequent *702 prosecution did not violate the Double Jeopardy Clause.[7]
Counts II, III, and IV of Foster's indictment are likewise not barred. These charged Foster under § 22-2307 (forbidding anyone to "threate[n] . . . to kidnap any person or to injure the person of another or physically damage the property of any person") for his alleged threats on three separate dates. Foster's contempt prosecution included charges that, on the same dates, he violated the CPO provision ordering that he not "in any manner threaten" Ana Foster. Conviction of the contempt required willful violation of the CPO which conviction under § 22-2307 did not; and conviction under § 22-2307 required that the threat be a threat to kidnap, to inflict bodily injury, or to damage propertywhich conviction of the contempt (for violating the CPO provision that Foster not "in any manner threaten") did not.[8] Each *703 offense therefore contained a separate element, and the Blockburger test for double jeopardy was not met.

IV
Having found that at least some of the counts at issue here are not barred by the Blockburger test, we must consider whether they are barred by the new, additional double jeopardy test we announced three Terms ago in Grady v. Corbin. [9] They undoubtedly are, since Grady prohibits "a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution [here, assault as an element of assault with intent to kill, or threatening as an element of threatening bodily injury], the government will *704 prove conduct that constitutes an offense for which the defendant has already been prosecuted [here, the assault and the threatening, which conduct constituted the offense of violating the CPO]." 495 U. S., at 510.
We have concluded, however, that Grady must be overruled. Unlike Blockburger analysis, whose definition of what prevents two crimes from being the "same offence," U. S. Const., Amdt. 5, has deep historical roots and has been accepted in numerous precedents of this Court, Grady lacks constitutional roots. The "same-conduct" rule it announced is wholly inconsistent with earlier Supreme Court precedent and with the clear common-law understanding of double jeopardy. See, e. g., Gavieres v. United States, 220 U. S., at 345 (in subsequent prosecution, "[w]hile it is true that the conduct of the accused was one and the same, two offenses resulted, each of which had an element not embraced in the other"). We need not discuss the many proofs of these statements, which were set forth at length in the Grady dissent. See 495 U. S., at 526 (opinion of Scalia, J.). We will respond, however, to the contrary contentions of today's proGrady dissents.
The centerpiece of Justice Souter's analysis is an appealing theory of a "successive prosecution" strand of the Double Jeopardy Clause that has a different meaning from its supposed "successive punishment" strand. We have often noted that the Clause serves the function of preventing both successive punishment and successive prosecution, see, e. g., North Carolina v. Pearce, 395 U. S. 711 (1969), but there is no authority, except Grady, for the proposition that it has different meanings in the two contexts. That is perhaps because it is embarrassing to assert that the single term "same offence" (the words of the Fifth Amendment at issue here) has two different meaningsthat what is the same offense is yet not the same offense. Justice Souter provides no authority whatsoever (and we are aware of none) for the bald assertion that "we have long held that [the government] *705 must sometimes bring its prosecutions for [separate] offenses together." Post, at 747. The collateral-estoppel effect attributed to the Double Jeopardy Clause, see Ashe v. Swenson, 397 U. S. 436 (1970), may bar a later prosecution for a separate offense where the Government has lost an earlier prosecution involving the same facts. But this does not establish that the Government "must . . . bring its prosecutions. . . together." It is entirely free to bring them separately, and can win convictions in both. Of course the collateralestoppel issue is not raised in this case.
Justice Souter relies upon four cases to establish the existence of some minimal antecedents to Grady. Post, at 749-758. The fountainhead of the "same-conduct" rule, he asserts, is In re Nielsen, 131 U. S. 176 (1889). That is demonstrably wrong. Nielsen simply applies the common proposition, entirely in accord with Blockburger, that prosecution for a greater offense (cohabitation, defined to require proof of adultery) bars prosecution for a lesser included offense (adultery). That is clear from the Nielsen Court's framing of the question ("Being of opinion, therefore, that habeas corpus was a proper remedy for the petitioner, if the crime of adultery with which he was charged was included in the crime of unlawful cohabitation for which he was convicted and punished, that question is now to be considered," 131 U. S., at 185 (emphasis added)), from its legal analysis, id., at 186-189, and from its repeated observations that cohabitation required proof of adultery, id., at 187, 189.[10]
*706 His second case comes almost a century later. Brown v. Ohio, 432 U. S. 161 (1977), contains no support for his position except a footnote that cites Nielsen for the proposition that "[t]he Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense." Brown, supra, at 166-167, n. 6. Not only is this footnote the purest dictum, but it flatly contradicts the text of the opinion which, on the very next page, describes Nielsen as the first Supreme Court case to endorse the Blockburger rule. Brown, supra, at 168. Quoting that suspect dictum multiple times, see post, at 748, 754, cannot convert it into case law. See United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc., 508 U. S. 439, 463, n. 11 (1993) (emphasizing "the need to distinguish an opinion's holding from its dicta"). The holding of Brown, like that of Nielsen, rests squarely upon the existence of a lesser included offense. 432 U. S., at 162 (setting out question presented).
The third case is Harris, which Justice Souter asserts was a reaffirmation of what he contends was the earlier holding in Nielsen, that the Blockburger test is "insufficien[t] for determining when a successive prosecution [is] barred," and that conduct, and not merely elements of the offense, must be the object of inquiry. Post, at 755. Surely not. Harris never uses the word "conduct," and its entire discussion focuses on the elements of the two offenses. See, e. g., 433 U. S., at 682-683, n. (to prove felony murder, "it was necessary for all the ingredients of the underlying felony" to be proved). Far from validating Justice Souter's extraordinarily implausible reading of Nielsen, Harris plainly rejects that reading, treating the earlier case as having focused (like Blockburger ) upon the elements of the offense. Immediately *707 after stating that conviction for felony murder, a "greater crime," "cannot be had without conviction of the lesser crime," the Harris Court quotes Nielsen `s statement that "`a person [who] has been tried and convicted for a crime which has various incidents included in it, . . . cannot be a second time tried for one of those incidents.' " 433 U. S., at 682-683, quoting from 131 U. S., at 188. It is clear from that context that Harris regarded "incidents included" to mean "offenses included"a reference to defined crimes rather than to conduct.
Finally, Justice Souter misdescribes Vitale. Despite his bold assertion to the contrary, see post, at 757, Vitale unquestionably reads Harris as merely an application of the double jeopardy bar to lesser and greater included offenses.[11] Justice Souter instead elevates the statement in Vitale that, on certain hypothetical facts, the petitioner would have a "substantial" "claim" of double jeopardy on a Grady -type theory, see post, at 756-757, into a holding that the petitioner would win on that theory. Post, at 757, 763. No Justice, the Vitale dissenters included, has ever construed this passage as answering, rather than simply raising, the question on which we later granted certiorari in Grady. See 447 U. S., at 426 (Stevens, J., dissenting) (in addition to finding the same-conduct claim "substantial," dissent would find it "dispositive"). See also Grady, 495 U. S., at 510 (Vitale "suggested" same-conduct test adopted in Grady ).
In contrast to the above-discussed dicta relied upon by Justice Souter, there are two pre-Grady (and postNielsen ) cases that are directly on point. In both Gavieres v. United States, 220 U. S., at 343, and Burton v. United States, 202 U. S. 344, 379-381 (1906), the Court upheld subsequent *708 prosecutions after concluding that the Blockburger test (and only the Blockburger test) was satisfied.[12] These cases are incompatible with the belief that Nielsen had created an additional requirement beyond the "elements" standard.[13] Totally ignored by Justice Souter are the *709 many early American cases construing the Double Jeopardy Clause, which support only an "elements" test. See Grady, supra, at 533-535 (Scalia, J., dissenting).[14]
But Grady was not only wrong in principle; it has already proved unstable in application. Less than two years after it came down, in United States v. Felix, 503 U. S. 378 (1992), we were forced to recognize a large exception to it. There we concluded that a subsequent prosecution for conspiracy to manufacture, possess, and distribute methamphetamine was not barred by a previous conviction for attempt to manufacture the same substance. We offered as a justification for avoiding a "literal" (i. e., faithful) reading of Grady "longstanding authority" to the effect that prosecution for conspiracy is not precluded by prior prosecution for the substantive offense. Felix, supra, at 388-391. Of course the very existence of such a large and longstanding "exception" to the *710 Grady rule gave cause for concern that the rule was not an accurate expression of the law. This "past practice" excuse is not available to support the ignoring of Grady in the present case, since there is no Supreme Court precedent even discussing this fairly new breed of successive prosecution (criminal contempt for violation of a court order prohibiting a crime, followed by prosecution for the crime itself).
A hypothetical based on the facts in Harris reinforces the conclusion that Grady is a continuing source of confusion and must be overruled. Suppose the State first tries the defendant for felony murder, based on robbery, and then indicts the defendant for robbery with a firearm in the same incident. Absent Grady, our cases provide a clear answer to the double jeopardy claim in this situation. Under Blockburger, the second prosecution is not barredas it clearly was not barred at common law, as a famous case establishes. In King v. Vandercomb, 2 Leach. 708, 717, 168 Eng. Rep. 455, 460 (K. B. 1796), the government abandoned, midtrial, prosecution of defendant for burglary by breaking and entering and stealing goods, because it turned out that no property had been removed on the date of the alleged burglary. The defendant was then prosecuted for burglary by breaking and entering with intent to steal. That second prosecution was allowed, because "these two offences are so distinct in their nature, that evidence of one of them will not support an indictment for the other." Ibid. Accord, English and American cases cited in Grady, 495 U. S., at 532-535 (Scalia, J., dissenting).[15]
*711 Having encountered today yet another situation in which the pre-Grady understanding of the Double Jeopardy Clause allows a second trial, though the "same-conduct" test would not, we think it time to acknowledge what is now, three years after Grady, compellingly clear: The case was a mistake. We do not lightly reconsider a precedent, but, because Grady contradicted an "unbroken line of decisions," contained "less than accurate" historical analysis, and has produced "confusion," [16] we do so here. Solorio v. United States, 483 U. S. *712 435, 439, 442, 450 (1987). Although stare decisis is the "preferred course" in constitutional adjudication, "when governing decisions are unworkable or are badly reasoned, `this Court has never felt constrained to follow precedent.' " Payne v. Tennessee, 501 U. S. 808, 827 (1991) (quoting Smith v. Allwright, 321 U. S. 649, 665 (1944), and collecting examples). We would mock stare decisis and only add chaos to our double jeopardy jurisprudence by pretending that Grady survives when it does not. We therefore accept the Government's invitation to overrule Grady, and Counts II, III, IV, and V of Foster's subsequent prosecution are not barred.[17]

V
Dixon's subsequent prosecution, as well as Count I of Foster's subsequent prosecution, violate the Double Jeopardy Clause.[18] For the reasons set forth in Part IV, the other counts of Foster's subsequent prosecution do not violate the Double Jeopardy Clause.[19] The judgment of the District of Columbia Court of Appeals is affirmed in part and reversed in part, and the case is remanded for proceedings not inconsistent with this opinion.
It is so ordered. 
*713 Chief Justice Rehnquist, with whom Justice O'Connor and Justice Thomas join, concurring in part and dissenting in part.
Respondent Alvin Dixon possessed cocaine with intent to distribute it. For that he was held in contempt of court for violating a condition of his bail release. He was later criminally charged for the same conduct with possession with intent to distribute cocaine. Respondent Michael Foster assaulted and threatened his estranged wife. For that he was held in contempt of court for violating a civil protection order entered in a domestic relations proceeding. He was later criminally charged for the same conduct with assault, threatening to injure another, and assault with intent to kill.
The Court today concludes that the Double Jeopardy Clause prohibits the subsequent prosecutions of Foster for assault and Dixon for possession with intent to distribute cocaine, but does not prohibit the subsequent prosecutions of Foster for threatening to injure another or for assault with intent to kill. After finding that at least some of the charges here are not prohibited by the "same-elements" test set out in Blockburger v. United States, 284 U. S. 299, 304 (1932), the Court goes on to consider whether there is a double jeopardy bar under the "same-conduct" test set out in Grady v. Corbin, 495 U. S. 508, 510 (1990), and determines that there is. However, because the same-conduct test is inconsistent with the text and history of the Double Jeopardy Clause, was a departure from our earlier precedents, and has proven difficult to apply, the Court concludes that Grady must be overruled. I do not join Part III of Justice Scalia's opinion because I think that none of the criminal prosecutions in this case were barred under Blockburger. I must then confront the expanded version of double jeopardy embodied in Grady. For the reasons set forth in the dissent in Grady, supra, at 526 (opinion of Scalia, J.), and in Part IV of the Court's opinion, I, too, think that Grady must be overruled. I *714 therefore join Parts I, II, and IV of the Court's opinion, and write separately to express my disagreement with Justice Scalia's application of Blockburger in Part III.
In my view, Blockburger `s same-elements test requires us to focus, not on the terms of the particular court orders involved, but on the elements of contempt of court in the ordinary sense. Relying on Harris v. Oklahoma, 433 U. S. 682 (1977), a three-paragraph per curiam in an unargued case, Justice Scalia concludes otherwise today, and thus incorrectly finds in Part IIIA of his opinion that the subsequent prosecutions of Dixon for drug distribution and of Foster for assault violated the Double Jeopardy Clause. In so doing, Justice Scalia rejects the traditional viewshared by every Federal Court of Appeals and State Supreme Court that addressed the issue prior to Grady that, as a general matter, double jeopardy does not bar a subsequent prosecution based on conduct for which a defendant has been held in criminal contempt. I cannot subscribe to a reading of Harris that upsets this previously well-settled principle of law. Because the generic crime of contempt of court has different elements than the substantive criminal charges in this case, I believe that they are separate offenses under Blockburger. I would therefore limit Harris to the context in which it arose: where the crimes in question are analogous to greater and lesser included offenses. The crimes at issue here bear no such resemblance.
Justice Scalia dismisses out-of-hand, see ante, at 699, the Government's reliance on several statements from our prior decisions. See In re Debs, 158 U. S. 564, 594, 599-600 (1895); In re Chapman, 166 U. S. 661, 672 (1897); Jurney v. MacCracken, 294 U. S. 125, 151 (1935). Those statements are dicta, to be sure, and thus not binding on us as stare decisis. Yet they are still significant in that they reflect the unchallenged contemporaneous view among all courts that the Double Jeopardy Clause does not prohibit separate prosecutions for contempt and a substantive offense based *715 on the same conduct.[1] This view, which dates back to the English common law, see F. Wharton, Criminal Pleading and Practice § 444, p. 300 (8th ed. 1880), has prevailed to the present day. See generally 21 Am. Jur. 2d, Criminal Law § 250, p. 446 (1981). In fact, every Federal Court of Appeals and state court of last resort to consider the issue before Grady agreed that there is no double jeopardy bar to successive prosecutions for criminal contempt and substantive criminal offenses based on the same conduct. See, e. g., Hansen v. United States, 1 F. 2d 316, 317 (CA7 1924); Orban v. United States, 18 F. 2d 374, 375 (CA6 1927); State v. Sammons, 656 S. W. 2d 862, 868-869 (Tenn. Crim. App. 1982); Commonwealth v. Allen, 506 Pa. 500, 511-516, 486 A. 2d 363, 368-371 (1984), cert. denied, 474 U. S. 842 (1985); People v. Totten, 118 Ill. 2d 124, 134-139, 514 N. E. 2d 959, 963-965 (1987).[2] It is somewhat ironic, I think, that Justice Scalia today adopts a view of double jeopardy that did not come to the fore until after Grady, a decision which he (for the Court) goes on to emphatically reject as "lack[ing] constitutional roots." Ante, at 704.
At the heart of this pre-Grady consensus lay the common belief that there was no double jeopardy bar under Blockburger. There, we stated that two offenses are different for *716 purposes of double jeopardy if "each provision requires proof of a fact which the other does not." 284 U. S., at 304 (emphasis added). Applying this test to the offenses at bar, it is clear that the elements of the governing contempt provision are entirely different from the elements of the substantive crimes. Contempt of court comprises two elements: (i) a court order made known to the defendant, followed by (ii) willful violation of that order. In re Gorfkle, 444 A. 2d 934, 939 (D. C. 1982); In re Thompson, 454 A. 2d 1324, 1326 (D. C. 1982). Neither of those elements is necessarily satisfied by proof that a defendant has committed the substantive offenses of assault or drug distribution. Likewise, no element of either of those substantive offenses is necessarily satisfied by proof that a defendant has been found guilty of contempt of court.
Justice Scalia grounds his departure from Blockburger `s customary focus on the statutory elements of the crimes charged on Harris v. Oklahoma, supra, an improbable font of authority. See ante, at 698. A summary reversal, like Harris, "does not enjoy the full precedential value of a case argued on the merits." Connecticut v. Doehr, 501 U. S. 1, 12, n. 4 (1991); accord, Edelman v. Jordan, 415 U. S. 651, 671 (1974). Today's decision shows the pitfalls inherent in reading too much into a "terse per curiam. " Ante, at 698. Justice Scalia's discussion of Harris is nearly as long as Harris itself and consists largely of a quote, not from Harris, but from a subsequent opinion analyzing Harris. Justice Scalia then concludes that Harris somehow requires us to look to the facts that must be proved under the particular court orders in question (rather than under the general law of criminal contempt) in determining whether contempt and the related substantive offenses are the same for double jeopardy purposes. This interpretation of Harris is both unprecedented and mistaken.
Our double jeopardy cases applying Blockburger have focused on the statutory elements of the offenses charged, not *717 on the facts that must be proved under the particular indictment at issuean indictment being the closest analogue to the court orders in this case. See, e. g., Grady, 495 U. S., at 528 (Scalia, J., dissenting) ("Th[e] test focuses on the statutory elements of the two crimes with which a defendant has been charged, not on the proof that is offered or relied upon to secure a conviction"); Albernaz v. United States, 450 U. S. 333, 338 (1981) ("`[T]he Court's application of the test focuses on the statutory elements of the offense' " (quoting Iannelli v. United States, 420 U. S. 770, 785, n. 17 (1975))); United States v. Woodward, 469 U. S. 105, 108 (1985) (per curiam) (looking to the statutory elements of the offense in applying Blockburger ). By focusing on the facts needed to show a violation of the specific court orders involved in this case, and not on the generic elements of the crime of contempt of court, Justice Scalia's double jeopardy analysis bears a striking resemblance to that found in Grady not what one would expect in an opinion that overrules Grady. 
Close inspection of the crimes at issue in Harris reveals, moreover, that our decision in that case was not a departure from Blockburger `s focus on the statutory elements of the offenses charged. In Harris, we held that a conviction for felony murder based on a killing in the course of an armed robbery foreclosed a subsequent prosecution for robbery with a firearm. Though the felony-murder statute in Harris did not require proof of armed robbery, it did include as an element proof that the defendant was engaged in the commission of some felony. Harris v. State, 555 P. 2d 76, 80 (Okla. Crim. App. 1976). We construed this generic reference to some felony as incorporating the statutory elements of the various felonies upon which a felony-murder conviction could rest. Cf. Whalen v. United States, 445 U. S. 684, 694 (1980). The criminal contempt provision involved here, by contrast, contains no such generic reference which by definition incorporates the statutory elements of assault or drug distribution.
*718 Unless we are to accept the extraordinary view that the three-paragraph per curiam in Harris was intended to overrule sub silentio our previous decisions that looked to the statutory elements of the offenses charged in applying Blockburger, we are bound to conclude, as does Justice Scalia, see ante, at 698, that the ratio decidendi of our Harris decision was that the two crimes there were akin to greater and lesser included offenses. The crimes at issue here, however, cannot be viewed as greater and lesser included offenses, either intuitively or logically. A crime such as possession with intent to distribute cocaine is a serious felony that cannot easily be conceived of as a lesser included offense of criminal contempt, a relatively petty offense as applied to the conduct in this case. See D. C. Code Ann. § 33-541(a)(2)(A) (Supp. 1992) (the maximum sentence for possession with intent to distribute cocaine is 15 years in prison). Indeed, to say that criminal contempt is an aggravated form of that offense defies common sense. Even courts that have found a double jeopardy bar in cases resembling this one have appreciated how counterintuitive that notion is. E. g., United States v. Haggerty, 528 F. Supp. 1286, 1297 (Colo. 1981).
But there is a more fundamental reason why the offenses in this case are not analogous to greater and lesser included offenses. A lesser included offense is defined as one that is "necessarily included" within the statutory elements of another offense. See Fed. Rule Crim. Proc. 31(c); Schmuck v. United States, 489 U. S. 705, 716-717 (1989). Taking the facts of Harris as an example, a defendant who commits armed robbery necessarily has satisfied one of the statutory elements of felony murder. The same cannot be said, of course, about this case: A defendant who is guilty of possession with intent to distribute cocaine or of assault has not necessarily satisfied any statutory element of criminal contempt. Nor, for that matter, can it be said that a defendant who is held in criminal contempt has necessarily satisfied any *719 element of those substantive crimes. In short, the offenses for which Dixon and Foster were prosecuted in this case cannot be analogized to greater and lesser included offenses; hence, they are separate and distinct for double jeopardy purposes.[3]
The following analogy, raised by the Government at oral argument, see Tr. of Oral Arg. 8-9, helps illustrate the absurd results that Justice Scalia's Harris /Blockburger analysis could in theory produce. Suppose that the offense in question is failure to comply with a lawful order of a police officer, see, e. g., Ind. Code § 9-21-81 (Supp. 1992), and that the police officer's order was, "Don't shoot that man." Under Justice Scalia's flawed reading of Harris, the elements of the offense of failure to obey a police officer's lawful order would include, for purposes of Blockburger `s sameelements test, the elements of, perhaps, murder or manslaughter, in effect converting those felonies into a lesser included offense of the crime of failure to comply with a lawful order of a police officer.
In sum, I think that the substantive criminal prosecutions in this case, which followed convictions for criminal contempt, *720 did not violate the Double Jeopardy Clause, at least before our decision in Grady. Under Grady, "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." 495 U. S., at 510. As the Court points out, see ante, at 703-704, this case undoubtedly falls within that expansive formulation: To secure convictions on the substantive criminal charges in this case, the Government will have to prove conduct that was the basis for the contempt convictions. Forced, then, to confront Grady, I join the Court in overruling that decision.
Justice White, with whom Justice Stevens joins, and with whom Justice Souter joins as to Part I, concurring in the judgment in part and dissenting in part.
I am convinced that the Double Jeopardy Clause bars prosecution for an offense if the defendant already has been held in contempt for its commission. Therefore, I agree with the Court's conclusion that both Dixon's prosecution for possession with intent to distribute cocaine and Foster's prosecution for simple assault were prohibited. In my view, however, Justice Scalia's opinion gives short shrift to the arguments raised by the United States. I also am uncomfortable with the reasoning underlying this holding, in particular the application of Blockburger v. United States, 284 U. S. 299 (1932), to the facts of this case, a reasoning that betrays an overly technical interpretation of the Constitution. As a result, I concur only in the judgment in Part IIIA.
The mischief in the Court's approach is far more apparent in the second portion of today's decision. Constrained by its narrow reading of the Double Jeopardy Clause, it asserts that the fate of Foster's remaining counts depends on Grady v. Corbin, 495 U. S. 508 (1990), which the Court then chooses *721 to overrule. Ante, at 704. I do not agree. Resolution of the question presented by Foster's case no more requires reliance on Grady than it points to reasons for reversing that decision. Rather, as I construe the Clause, double jeopardy principles compel equal treatment of all of Foster's counts. I dissent from the Court's holding to the contrary. Inasmuch as Grady has been dragged into this case, however, I agree with Justice Blackmun and Justice Souter that it should not be overruled. Post, at 741, 744. From this aspect of the Court's opinion as well, I dissent.

I
The chief issue before us is whether the Double Jeopardy Clause applies at all to cases such as these. Justice Scalia finds that it applies, but does so in conclusory fashion, without dealing adequately with either the Government's arguments or the practical consequences of today's decision. Both, in my view, are worthy of more.

A
The position of the United States is that, for the purpose of applying the Double Jeopardy Clause, a charge of criminal contempt for engaging in conduct that is proscribed by court order and that is in turn forbidden by the criminal code is an offense separate from the statutory crime. The United States begins by pointing to prior decisions of this Court to support its view. Heavy reliance is placed on In re Debs, 158 U. S. 564 (1895), but, as the majority notes, see ante, at 699, the relevant portion of the opinion is dictumand seriously weakened dictum at that. See Bloom v. Illinois, 391 U. S. 194 (1968).
The Government also relies on two cases involving Congress' power to punish by contempt a witness who refuses to testify before it, In re Chapman, 166 U. S. 661 (1897), and Jurney v. MacCracken, 294 U. S. 125 (1935). Both cases appear to lean in the Government's direction, but neither is conclusive. *722 First, the statements were dicta. The claim in Jurney and Chapman was that the power to punish for contempt and the power to punish for commission of the statutory offense could not coexist side by side. But in neither were both powers exercised; in neither case did the defendant face a realistic threat of twice being put in jeopardy. In fact, as the majority notes, ante, at 698-699, n. 2, the Court expressed doubt that consecutive prosecutions would be brought in such circumstances. See Chapman, supra, at 672.
Second, both decisions concern the power to deal with acts interfering directly with the performance of legislative functions, a power to which not all constitutional restraints on the exercise of judiciary authority apply. See Marshall v. Gordon, 243 U. S. 521, 547 (1917). The point, spelled out in Marshall, is this: In a case such as Chapman, where the contempt proceeding need not "resor[t] to the modes of trial required by constitutional limitations . . . for substantive offenses under the criminal law," 243 U. S., at 543, so too will it escape the prohibitions of the Double Jeopardy Clause. If, however, it is of such a character as to be subject to these constitutional restrictions, "those things which, as pointed out in In re Chapman . . . , were distinct and did not therefore the one frustrate the otherthe implied legislative authority to compel the giving of testimony and the right criminally to punish for failure to do sowould become one and the same and the exercise of one would therefore be the exertion of, and the exhausting of the right to resort to, the other." Id. , at 547.
Marshall thus suggests that application of the Double Jeopardy Clause, like that of other constitutional guarantees, is a function of the type of contempt proceeding at issue. Chapman, it follows, cannot be said to control this case. Rather, whatever application Chapman (and, by implication, Jurney ) might have in the context of judicial contempt is limited to cases of in-court contempts that constitute direct obstructions of the judicial process and for which summary *723 proceedings remain acceptable. Cf. Marshall, supra, at 543. Neither Dixon nor Foster is such a case.[1]
The United States' second, more powerful, argument is that contempt and the underlying substantive crime constitute two separate offenses for they involve injuries to two distinct interests, the one the interest of the court in preserving its authority, the other the public's interest in being protected from harmful conduct. This position finds support in Justice Blackmun's partial dissent, see post, at 743, and is bolstered by reference to numerous decisions acknowledging the importance and role of the courts' contempt power. See, e. g., Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787, 800 (1987); Michaelson v. United States ex rel. Chicago, St. P., M. & O. R. Co., 266 U. S. 42, 65 (1924); Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 450 (1911). It cannot lightly be dismissed. Indeed, we recognized in Young, supra, that contempt "proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that *724 violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings." Id. , at 800.
The fact that two criminal prohibitions promote different interests may be indicative of legislative intent and, to that extent, important in deciding whether cumulative punishments imposed in a single prosecution violate the Double Jeopardy Clause. See Missouri v. Hunter, 459 U. S. 359, 366-368 (1983). But the cases decided today involve instances of successive prosecutions in which the interests of the defendant are of paramount concern. To subject an individual to repeated prosecutions exposes him to "embarrassment, expense and ordeal," Green v. United States, 355 U. S. 184, 187 (1957), violates principles of finality, United States v. Wilson, 420 U. S. 332, 343 (1975), and increases the risk of a mistaken conviction. That one of the punishments is designed to protect the court rather than the public is, in this regard, of scant comfort to the defendant.[2]
It is true that the Court has not always given primacy to the defendant's interest. In particular, the Government directs attention to the dual sovereignty doctrine under which, "[w]hen a defendant in a single act violates the `peace *725 and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct `offences.' " Heath v. Alabama, 474 U. S. 82, 88 (1985) (quoting United States v. Lanza, 260 U. S. 377, 382 (1922)). See also United States v. Wheeler, 435 U. S. 313, 317 (1978); Moore v. Illinois, 14 How. 13, 19 (1852).
But the dual sovereignty doctrine is limited, by its own terms, to cases where "the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns." Heath, 474 U. S., at 88. "This determination," we explained, "turns on whether the two entities draw their authority to punish the offender from distinct sources of power," ibid. , not on whether they are pursuing separate interests. Indeed, the Court has rejected the United States' precise argument in the past, perhaps nowhere more resolutely than in Grafton v. United States, 206 U. S. 333 (1907). In that case, the defendant, a private in the United States Army stationed in the Philippines, was tried before a general court-martial for homicide. Subsequent to Grafton's acquittal, the United States filed a criminal complaint in civil court based on the same acts. Seeking to discredit the view that the Double Jeopardy Clause would be violated by this subsequent prosecution, the Government asserted that "Grafton committed two distinct offensesone against military law and discipline, the other against the civil law which may prescribe the punishment for crimes against organized society by whomsoever those crimes are committed." Id. , at 351. To which the Court responded:
"Congress, by express constitutional provision, has the power to prescribe rules for the government and regulation of the Army, but those rules must be interpreted in connection with the prohibition against a man's being put twice in jeopardy for the same offense. . . . If, therefore, a person be tried for an offense in a tribunal deriving *726 its jurisdiction and authority from the United States and is acquitted or convicted, he cannot again be tried for the same offense in another tribunal deriving its jurisdiction and authority from the United States. . . . [T]he same acts constituting a crime against the United States cannot, after the acquittal or conviction of the accused in a court of competent jurisdiction, be made the basis of a second trial of the accused for that crime in the same or in another court, civil or military, of the same government. Congress has chosen, in its discretion, to confer upon general courts-martial authority to try an officer or soldier for any crime, not capital, committed by him in the territory in which he is serving. When that was done the judgment of such military court was placed upon the same level as the judgments of other tribunals when the inquiry arises whether an accused was, in virtue of that judgment, put in jeopardy of life or limb." Id. , at 352.
Grafton, and the principle itembodies, are controlling. The Superior Court and the District of Columbia Court of Appeals were created by Congress, pursuant to its power under Article I of the Constitution. See Palmore v. United States, 411 U. S. 389 (1973). In addition, the specific power exercised by the courts in this case were bestowed by the Legislature. See ante, at 691. As we observed in United States v. Providence Journal Co., 485 U. S. 693 (1988), "[t]he fact that the allegedly criminal conduct concerns a violation of a court order instead of common law or a statutory prohibition does not render the prosecution any less an exercise of the sovereign power of the United States." Id. , at 700. It is past dispute, in other words, that "the two tribunals that tried the accused exert all their powers under and by the authority of the same governmentthat of the United States," Grafton, supra, at 355, and, therefore, that the dual *727 sovereignty doctrine poses no problem. Cf. Heath, supra, at 88.[3]

B
Both the Government and amici submit that application of the Double Jeopardy Clause in this context carries grave practical consequences. See also post, at 742-743 (Blackmun, J., concurring in judgment in part and dissenting in part). Itwould, it is argued, cripple the power to enforce court orders or, alternatively, allow individuals to escape serious punishment for statutory criminal offenses. The argument, an offshoot of the principle of necessity familiar to the law of contempt, see, e. g., United States v. Wilson, 421 U. S. 309, 315-318 (1975), is that, just as we have relaxed certain procedural requirements in contempt proceedings where time is of the essence and an immediate remedy is needed to "prevent a breakdown of the proceedings," id. , at 319, so too should we exclude double jeopardy protections from this setting lest we do damage to the courts' authority. In other words, "[t]he ability to punish disobedience to judicial orders [being] regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority," Young, 481 U. S., at 796, its exercise should not be inhibited by fear that it might immunize defendants from subsequent criminal prosecution.
Adherence to double jeopardy principles in this context, however, will not seriously deter the courts from taking appropriate steps to ensure that their authority is not flouted. *728 Courts remain free to hold transgressors in contempt and punish them as they see fit. The Government counters that this possibility will prove to be either illusoryif the prosecuting authority declines to initiate proceedings out of fear that they could jeopardize more substantial punishment for the underlying crimeor too costlyif the prosecuting authority, the risk notwithstanding, chooses to go forward. But it is not fanciful to imagine that judges and prosecutors will select a third option, which is to ensure, where necessary or advisable, that the contempt and the substantive charge be tried at the same time, in which case the double jeopardy issue "would be limited to ensuring that the total punishment did not exceed that authorized by the legislature." United States v. Halper, 490 U. S. 435, 450 (1989). Indeed, the Court recently exercised its supervisory power to suggest that a federal court "ordinarily should first request the appropriate prosecuting authority to prosecute contempt actions, and should appoint a private prosecutor only if that request is denied." Young, 481 U. S., at 801. Just as "[i]n practice, courts can reasonably expect that the public prosecutor will accept the responsibility for prosecution," ibid., so too can the public prosecutor reasonably anticipate that the court will agree to some delay ifneeded to bring the two actions together.
Against this backdrop, the appeal of the principle of necessity loses much of its force. Ultimately, the urgency of punishing such contempt violations is no less, but by the same token no more, than that of punishing violations of criminal laws of general applicationin which case, we simply do not question the defendant's right to the "protections worked out carefully over the years and deemed fundamental to our system of justice," Bloom v. Illinois, 391 U. S., at 208, including the protection of the Double Jeopardy Clause. "Perhaps to some extent we sacrifice efficiency, expedition, and economy, but the choice . . . has been made, and retained, in the Constitution. *729 We see no sound reason in logic or policy not to apply it in the area of criminal contempt." Id., at 209.[4]
Dixon aptly illustrates these points. In that case, the motion requesting modification of the conditions of Dixon's release was filed by the Government, the same entity responsible for prosecution of the drug offense. Indeed, in so doing it relied explicitly on the defendant's indictment on the cocaine charge. 598 A. 2d 724, 728 (D. C. 1991). Logically, any problem of coordination or of advance notice of the impending prosecution for the substantive offense was at most minimal. Nor, aside from the legitimate desire to punish all offenders swiftly, does there appear to have been any real need to hold Dixon in contempt immediately, without waiting for the second trial. By way of comparison, at the time of his drug offense Dixon was awaiting trial for second-degree murder, a charge that had been brought some 11 months earlier.
Besides, in the situation where a person has violated a condition of release, there generally exist a number of alternatives under which the defendant's right against being put twice in jeopardy for the same offense could be safeguarded, while ensuring that disregard of the court's authority not go unsanctioned. To the extent that they are exercised with due regard for the Constitution, such options might include modification of release conditions or revocation of bail and detention.[5] As respondents acknowledge, these solutions *730 would raise no double jeopardy problem. See Tr. of Oral Arg. 30.
More difficult to deal with are the circumstances surrounding Foster's defiance of the court order. Realization of the scope of domestic violenceaccording to the American Medical Association (AMA), "the single largest cause of injury to women," AMA, Five Issues in American Health 5 (1991) has come with difficulty, and it has come late.
There no doubt are time delays in the operation of the criminal justice system that are frustrating; they even can be perilous when an individual is left exposed to a defendant's potential violence. That is true in the domestic context; it is true elsewhere as well. Resort to more expedient methods therefore is appealing, and in many cases permissible. Under today's decision, for instance, police officers retain the power to arrest for violation of a civil protection order. Where the offense so warrants, judges can haul the assailant before the court, charge him with criminal contempt, and hold him without bail. See United States v.Salerno, 481 U. S. 739 (1987); United States v. Edwards, 430 A. 2d 1321 (D. C. 1981). Also, cooperation between the government and parties bringing contempt proceedings can be achieved. The various actors might not have thought such cooperation necessary in the past; after today's decision, I suspect they will.[6]
*731 Victims, understandably, would prefer to have access to a proceeding in which swift and expeditious punishment could be inflicted for that offense without prejudice to a subsequent full-blown criminal trial. The justification for such a system, however, has nothing to do with preventing disruption of a court's proceedings or even with vindicating its authority. While, under the principle of necessity, contempt proceedings have been exempted from some constitutional constraints, this was done strictly "to secure judicial authority from obstruction in the performance of its duties to the end that means appropriate for the preservation and enforcement of the Constitution may be secured." Ex parte Hudgings, 249 U. S. 378, 383 (1919). No such end being invoked here, the principle of necessity cannot be summoned for the sole purpose of letting contempt proceedings achieve what, under our Constitution, other criminal trials cannot.

II
If, as the Court agrees, the Double Jeopardy Clause cannot be ignored in this context, my view is that the subsequent prosecutions in both Dixon and Foster were impermissible as to all counts. I reach this conclusion because the offenses at issue in the contempt proceedings were either identical to, or lesser included offenses of, those charged in the subsequent prosecutions. Justice Scalia's contrary conclusion as to some of Foster's counts, which he reaches by exclusive focus on the formal elements of the relevant crimes, is divorced from the purposes of the constitutional provision he purports to apply. Moreover, the results to which this approach would lead are indefensible.

A
The contempt orders in Foster and Dixon referred in one case to the District's laws regarding assaults and threats, and, in the other, to the criminal code in its entirety. The prohibitions imposed by the court orders, in other words, *732 duplicated those already in place by virtue of the criminal statutes. Aside from differences in the sanctions inflicted, the distinction between being punished for violation of the criminal laws and being punished for violation of the court orders, therefore, is simply this: Whereas in the former case "the entire population" is subject to prosecution, in the latter such authority extends only to "those particular persons whose legal obligations result from their earlier participation in proceedings before the court." Young, 481 U. S., at 800, n. 10. But the offenses that are to be sanctioned in either proceeding must be similar, since the contempt orders incorporated, in full or in part, the criminal code.[7]
*733 Thus, in this case, the offense for which Dixon was held in contempt was possession with intent to distribute drugs. Since he previously had been indicted for precisely the same offense, the double jeopardy bar should apply. In Foster's contempt proceeding, he was acquitted with respect to threats allegedly made on November 12, 1987, and March 26 and May 17, 1988. He was found in contempt of court for having committed the following offenses: Assaulting his wife on November 6, 1987, and May 21, 1988, and threatening her on September 17, 1987. 598 A. 2d, at 727; App. 42. The subsequent indictment charged Foster with simple assault on November 6, 1987 (Count I); threatening to injure another on or about November 12, 1987, and March 26 and May 17, 1988 (Counts II, III, and IV); and assault with intent to kill on or about May 21, 1988 (Count V). All of the offenses for which Foster was either convicted or acquitted inthe contempt proceeding were similar to, or lesser included offenses of, those charged in the subsequent indictment. Because "the Fifth Amendment forbids successive prosecution . . . for a greater and lesser included offense," Brown v. Ohio, 432 U. S. 161, 169 (1977); see also Grafton, 206 U. S., at 349-351, the second set of trials should be barred in their entirety.

B
Professing strict adherence to Blockburger `s so-called "same-elements" test, see Blockburger v. United States, 284 U. S. 299 (1932), Justice Scalia opts for a more circuitous approach. The elements of the crime of contempt, he reasons, in this instance are (1) the existence and knowledge of a court, or CPO; and (2) commission of the underlying substantive offense. See ante, at 701. Where the criminal conduct that forms the basis of the contempt order is identical to that charged in the subsequent trial, Justice Scalia *734 concludes, Blockburger forbids retrial. All elements of Foster's simple assault offense being included in his previous contempt offense, prosecution on that ground is precluded. Ante, at 700. The same is true of Dixon's drug offense. Ibid. I agree with this conclusion, though would reach it rather differently: Because in a successive prosecution case the risk is that a person will have to defend himself more than once against the same charge, I would have put to the side the CPO (which, as it were, triggered the court's authority to punish the defendant for acts already punishable under the criminal laws) and compared the substantive offenses of which respondents stood accused in both prosecutions.[8]
The significance of our disaccord is far more manifest where an element is added to the second prosecution. Under Justice Scalia's view, the double jeopardy barrier is then removed because each offense demands proof of an element the other does not: Foster's conviction for contempt requires proof of the existence and knowledge of a CPO, which conviction for assault with intent to kill does not; his conviction for assault with intent to kill requires proof of an intent to kill, which the contempt conviction did not. Ante, at 701. Finally, though he was acquitted in the contempt proceedings with respect to the alleged November 12, March 26, and May 17 threats, his conviction under the threat charge in the subsequent trial required the additional proof that the threat be to kidnap, to inflict bodily injury, or to damage property. Ante, at 702. As to these counts, and absent any collateral-estoppel problem, see ante, at 712, *735 n. 17, Justice Scalia finds that the Constitution does not prohibit retrial.
The distinction drawn by Justice Scalia is predicated on a reading of the Double Jeopardy Clause that is abstracted from the purposes the constitutional provision is designed to promote. To focus on the statutory elements of a crime makes sense where cumulative punishment is at stake, for there the aim simply is to uncover legislative intent. The Blockburger inquiry, accordingly, serves as a means to determine this intent, as our cases have recognized. See Missouri v. Hunter, 459 U. S., at 368. But, as Justice Souter shows, adherence to legislative will has very little to do with the important interests advanced by double jeopardy safeguards against successive prosecutions. Post, at 744. The central purpose of the Double Jeopardy Clause being to protect against vexatious multiple prosecutions, see Hunter, supra, at 365; United States v. Wilson, 420 U. S., at 343, these interests go well beyond the prevention of unauthorized punishment. The same-elements test is an inadequate safeguard, for it leaves the constitutional guarantee at the mercy of a legislature's decision to modify statutory definitions. Significantly, therefore, this Court has applied an inflexible version of the same-elements test only once, in 1911, in a successive prosecution case, see Gavieres v. United States, 220 U. S. 338 (1911), and has since noted that "[t]he Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense." Brown, 432 U. S., at 166-167, n. 6. Rather, "[e]ven if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first." Ibid. 
Take the example of Count V in Foster: For all intents and purposes, the offense for which he was convicted in the contempt proceeding was his assault against his wife. The *736 majority, its eyes fixed on the rigid elements test, would have his fate turn on whether his subsequent prosecution charges "simple assault" or "assault with intent to kill." Yet, because the crime of "simple assault" is included within the crime of "assault with intent to kill," the reasons that bar retrial under the first hypothesis are equally present under the second: These include principles of finality, see United States v. Wilson, supra, at 343; protecting Foster from "embarrassment" and "expense," Green v. United States, 355 U. S., at 187; and preventing the Government from gradually fine-tuning its strategy, thereby minimizing exposure to a mistaken conviction, id. , at 188. See also Tibbs v. Florida, 457 U. S. 31, 41 (1982); Arizona v. Washington, 434 U. S. 497, 503-504 (1978); supra, at 724.
Analysis of the threat charges (Counts IIIV) makes the point more clearly still. In the contempt proceeding, it will be recalled, Foster was acquitted of thearguably lesser includedoffense of threatening "in any manner." As we have stated:
"[T]he law attaches particular significance to an acquittal. To permit a second trial after an acquittal, however mistaken the acquittal might have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant so that `even though innocent he may be found guilty.' " United States v. Scott, 437 U. S. 82, 91 (1978) (citation omitted).
To allow the Government to proceed on the threat counts would present precisely the risk of erroneous conviction the Clause seeks to avoid. That the prosecution had to establish the existence of the CPO in the first trial, in short, does not in any way modify the prejudice potentially caused to a defendant by consecutive trials.
To respond, as the majority appears to do, that concerns relating to the defendant's interests against repeat trials are *737 "unjustified" because prosecutors "have little to gain and much to lose" from bringing successive prosecutions and because "the Government must be deterred from abusive, repeated prosecutions of a single offender for similar offenses by the sheer press of other demands upon prosecutorial and judicial resources," ante, at 710-711, n. 15, is to get things exactly backwards. The majority's prophesies might be correct, and double jeopardy might be a problem that will simply take care of itself. Not so, however, according to the Constitution, whose firm prohibition against double jeopardy cannot be satisfied by wishful thinking.

C
Further consequencesat once illogical and harmful flow from Justice Scalia's approach.[9] I turn for illustration once more to Foster's assault case. In his second prosecution, the Government brought charges of assault with intent to kill. In the District of Columbia, Superior Court Criminal Rule 31(c)which faithfully mirrors its federal counterpart, Federal Rule of Criminal Procedure 31(c)provides that a "defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." This provision has been construed to require the jury to determine guilt of all lesser included offenses. See Simmons v. United States, 554 A. 2d 1167 (D. C. 1989). Specifically, "[a] defendant is entitled to a lesser-included offense instruction when (1) all elements of the lesser offense are included within the offense charged, and (2) there is a sufficient evidentiary basis for the lesser charge." Rease v. United States, 403 A. 2d 322, 328 (D. C. 1979) (citations omitted).
Simple assault being a lesser included offense of assault with intent to kill, cf.Keeble v. United States, 412 U. S. 205 *738 (1973), the jury in the second prosecution would in all likelihood receive instructions on the lesser offense and could find Foster guilty of simple assault. In short, while the Government cannot, under the Constitution, bring charges of simple assault, it apparently can, under the majority's interpretation, secure a conviction for simple assault, so long as it prosecutes Foster for assault with intent to kill. As I see it, Foster will have been put in jeopardy twice for simple assault.[10] The result is as unjustifiable as it is pernicious. It *739 stems, I believe, from a "hypertechnical and archaic approach," Ashe v. Swenson, 397 U. S. 436, 444 (1970).
"Archaic" might not quite be the word, for even as far back as 1907 the Court appeared to hold a more pragmatic view. Defendant's court-martial in Grafton was authorized under the 62d Article of War, pursuant to which Congress granted military courts the power to try "officers and soldiers" in time of peace "for any offense, not capital, which the civil law declares to be a crime against the public." 206 U. S., at 341-342, 348, 351. Grafton faced the following charge: "`In that Private Homer E. Grafton . . . being a sentry on post, did unlawfully, willfully, and feloniously kill Florentino Castro, a Philippino . . . [and] Felix Villanueva, a Philippino.' " Id., at 341. He was acquitted. Id. , at 342. Some three months later, Grafton was prosecuted in a civil criminal court. He was charged with the crime of "assassination," defined as a killing accompanied by any of the following: "(1) With treachery; (2) For price or promise of reward; (3) By means of flood, fire, or poison; (4) With deliberate premeditation; (5) With vindictiveness, by deliberately and inhumanly increasing the suffering of the person attacked." Id. , at 343. Grafton ultimately was found guilty of homicide, a lesser included offense. Id. , at 344.
To convict Grafton in the first proceeding, then, it had to be established that (1) he was an officer or a soldier, and (2) he unlawfully killed. In the civil tribunal, the prosecution was required to prove (1) the killing, and (2) some further element, as specified. Had Grafton been tried in 1993 rather than 1907, I suppose that an inflexible Blockburger test, which asks whether "each provision requires proof of a fact the other does not," 284 U. S., at 304, would uncover no double jeopardy problem. At the time, though, the Court looked at matters differently: Both trials being for the same killing, and "[t]he identity of the offenses [being] determined, *740 not by their grade, but by their nature," id. , at 350, prosecuting Grafton for assassination meant twice putting him in jeopardy for the same offense.
I would dispose of Foster's case in like fashion, and focus on what Justice Scalia overlooks: The interests safeguarded by the Double Jeopardy Clause, and the fact that Foster should not have to defend himself twice against the same charges. When the case is so viewed, the condition that Foster be subject to a contempt order as a practical matter is analogous to the condition that Grafton be a soldier, for it triggered the court's authority to punish offenses already prescribed by the criminal law. At that point, the relevant comparison for double jeopardy purposes should be between the offenses charged in the two proceedings.

III
Once it is agreed that the Double Jeopardy Clause applies in this context, the Clause, properly construed, both governs this case and disposes of the distinction between Foster's charges upon which Justice Scalia relies. I therefore see little need to draw Grady into this dispute. In any event, the United States itself has not attempted to distinguish between Dixon and Foster or between the charges of "assault" on the one hand and, on the other, "assault with intent to kill" and "threat to injure another." The issue was not raised before the Court of Appeals or considered by it, and it was neither presented in the petition for certiorari nor briefed by either party. Under these circumstances, it is injudicious to address this matter. See, e. g., Mazer v. Stein, 347 U. S. 201, 206, n. 5 (1954); Adickes v. S. H. Kress & Co., 398 U. S. 144, 147, n. 2 (1970).
The majority nonetheless has chosen to consider Grady anew and to overrule it. I agree with Justice Blackmun and Justice Souter that such a course is both unwarranted and unwise. See post, at 741, 744. Hence, I dissent from the judgment overruling Grady. 

*741 IV
Believing that the Double Jeopardy Clause bars Foster's and Dixon's successive prosecutions on all counts, I would affirm the judgment of the District of Columbia Court of Appeals. I concur in the judgment of the Court in Part IIIA, which holds that Dixon's subsequent prosecution and Count I of Foster's subsequent prosecution were barred. I disagree with Justice Scalia's application of Blockburger in Part IIIB. From Part IV of the opinion, in which the majority decides to overrule Grady, I dissent.
Justice Blackmun, concurring in the judgment in part and dissenting in part.
I cannot agree that contempt of court is the "same offence" under the Double Jeopardy Clause as either assault with intent to kill or possession of cocaine with intent to distribute it. I write separately to emphasize two interrelated points.

I
I agree with Justice Souter that "the Blockburger test is not the exclusive standard for determining whether the rule against successive prosecutions applies in a given case." Post, at 756. I also share both his and Justice White's dismay that the Court so cavalierly has overruled a precedent that is barely three years old and that has proved neither unworkable nor unsound. I continue to believe that Grady v. Corbin, 495 U. S. 508 (1990), was correctly decided, and that the Double Jeopardy Clause prohibits a subsequent criminal prosecution where the proof required to convict on the later offense would require proving conduct that constitutes an offense for which a defendant already has been prosecuted.
If this were a case involving successive prosecutions under the substantive criminal law (as was true in Harris v. Oklahoma, 433 U. S. 682 (1977), Illinois v. Vitale, 447 U. S. 410 (1980), and Grady ), I would agree that the Double Jeopardy *742 Clause could bar the subsequent prosecution. But we are concerned here with contempt of court, a special situation. We explained in Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787 (1987):
"The fact that we have come to regard criminal contempt as `a crime in the ordinary sense,' [Bloom v. Illi- nois, 391 U. S. 194, 201 (1968)], does not mean that any prosecution of contempt must now be considered an execution of the criminal law in which only the Executive Branch may engage. . . . That criminal procedure protections are now required in such prosecutions should not obscure the fact that these proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that violates specific duties imposed by the court itself, arising directly from the parties' participation in judicial proceedings." Id., at 799-800.
The purpose of contempt is not to punish an offense against the community at large but rather to punish the specific offense of disobeying a court order. This Court said nearly a century ago: "[A] court, enforcing obedience to its orders by proceedings for contempt, is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to." In re Debs, 158 U. S. 564, 596 (1895).

II
Contempt is one of the very few mechanisms available to a trial court to vindicate the authority of its orders. I fear that the Court's willingness to overlook the unique interests served by contempt proceedings not only will jeopardize the ability of trial courts to control those defendants under their supervision but will undermine their ability to respond effectively *743 to unmistakable threats to their own authority and to those who have sought the court's protection.
This fact is poignantly stressed by the amici: 
"[C]ontempt litigators and criminal prosecutors seek to further different interests. A battered woman seeks to enforce her private order to end the violence against her. In contrast, the criminal prosecutor is vindicating society `s interest in enforcing its criminal law. The two interests are not the same, and to consider the contempt litigator and the criminal prosecutor as one and the same would be to adopt an absurd fiction." Brief for Ayuda et al. as Amici Curiae 20 (emphasis in original).
Finally, I cannot so easily distinguish between "summary" and "nonsummary" contempt proceedings, ante, at 696-697, for the interests served in both are fundamentally similar. It is as much a "disruption of judicial process," ante, at 695, to disobey a judge's conditional release order as it is to disturb a judge's courtroom. And the interests served in vindicating the authority of the court are fundamentally different from those served by the prosecution of violations of the substantive criminal law. Because I believe that neither Dixon nor Foster would be "subject for the same offence to be twice put in jeopardy of life or limb," U. S. Const., Amdt. 5, I would reverse the judgment of the District of Columbia Court of Appeals.
Justice Souter, with whom Justice Stevens joins, concurring in the judgment in part and dissenting in part.
While I agree with the Court as far as it goes in holding that a citation for criminal contempt and an indictment for violating a substantive criminal statute may amount to charges of the "same offence" for purposes of the Double Jeopardy Clause, U. S. Const., Amdt. 5, I cannot join the Court in restricting the Clause's reach and dismembering the protection against successive prosecution that the Constitution *744 was meant to provide. The Court has read our precedents so narrowly as to leave them bereft of the principles animating that protection, and has chosen to overrule the most recent of the relevant cases, Grady v. Corbin, 495 U. S. 508 (1990), decided three years ago. Because I think that Grady was correctly decided, amounting merely to an expression of just those animating principles, and because, even if the decision had been wrong in the first instance, there is no warrant for overruling it now, I respectfully dissent. I join Part I of Justice White's opinion, and I would hold, as he would, both the prosecution of Dixon and the prosecution of Foster under all the counts of the indictment against him to be barred by the Double Jeopardy Clause.[1]

I
In providing that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," U. S. Const., Amdt. 5, the Double Jeopardy Clause protects against two distinct types of abuses. See North Carolina v. Pearce, 395 U. S. 711, 717 (1969). It protects against being punished more than once for a single offense, or "multiple punishment." Where a person is being subjected to more than one sentence, the Double Jeopardy Clause ensures that he is not receiving for one offense more than the punishment authorized. The Clause also protects against being prosecuted for the same offense more than once, or "successive prosecution." "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction." Ibid. (footnotes omitted). The Clause functions in different ways in the two contexts, and the analysis applied to claims of successive prosecution differs from that employed to analyze claims of multiple punishment.

*745 II
In addressing multiple punishments, "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Brown v. Ohio, 432 U. S. 161, 165 (1977). Courts enforcing the federal guarantee against multiple punishment therefore must examine the various offenses for which a person is being punished to determine whether, as defined by the legislature, any two or more of them are the same offense. Over 60 years ago, this Court stated the test still used today to determine "whether two offenses are sufficiently distinguishable to permit the imposition of cumulative punishment," id., at 166:
"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger v. United States, 284 U. S. 299, 304 (1932).
The Blockburger test "emphasizes the elements of the two crimes." Brown, supra, at 166. Indeed, the determination whether two statutes describe the "same offence" for multiple punishment purposes has been held to involve only a question of statutory construction. We ask what the elements of each offense are as a matter of statutory interpretation, to determine whether the legislature intended "to impose separate sanctions for multiple offenses arising in the course of a single act or transaction." Iannelli v. United States, 420 U. S. 770, 785, n. 17 (1975). See, e. g., Brown, supra, at 167-168 (noting, in applying Blockburger, that state courts "`have the final authority to interpret . . . [a] State's legislation' " (quoting Garner v. Louisiana, 368 U. S. 157, 169 (1961))). The Court has even gone so far as to say that the Blockburger test will not prevent multiple punishment where legislative intent to the contrary is clear, at least in *746 the case of state law. "Where . . . a legislature specifically authorizes cumulative punishments under two statutes, regardless of whether those two statutes proscribe the `same' conduct under Blockburger, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." Missouri v. Hunter, 459 U. S. 359, 368-369 (1983); see Ohio v. Johnson, 467 U. S. 493, 499, n. 8 (1984).[2]
With respect to punishment for a single act, the Blockburger test thus asks in effect whether the legislature meant it to be punishable as more than one crime. To give the government broad control over the number of punishments that may be meted out for a single act, however, is consistent with the general rule that the government may punish as it chooses, within the bounds contained in the Eighth and Fourteenth Amendments. With respect to punishment, those provisions provide the primary protection against excess. "Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are `multiple' is essentially one of legislative intent." Johnson, supra, at 499 (citations and footnote omitted).

III
The interests at stake in avoiding successive prosecutions are different from those at stake in the prohibition against multiple punishments, and our cases reflect this reality. The protection against successive prosecutions is the central protection provided by the Clause. A 19th-century case of this Court observed that "[t]he prohibition is not against being *747 twice punished, but against being twice put in jeopardy; and the accused, whether convicted or acquitted, is equally put in jeopardy at the first trial." United States v. Ball, 163 U. S. 662, 669 (1896). "Where successive prosecutions are at stake, the guarantee serves `a constitutional policy of finality for the defendant's benefit.' " Brown, supra, at 165 (quoting United States v. Jorn, 400 U. S. 470, 479 (1971) (plurality opinion)).
The Double Jeopardy Clause prevents the government from "mak[ing] repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity." Green v. United States, 355 U. S. 184, 187 (1957). The Clause addresses a further concern as well, that the government not be given the opportunity to rehearse its prosecution, "honing its trial strategies and perfecting its evidence through successive attempts at conviction," Tibbs v. Florida, 457 U. S. 31, 41 (1982), because this "enhanc[es] the possibility that even though innocent [the defendant] may be found guilty," Green, supra, at 188.
Consequently, while the government may punish a person separately for each conviction of at least as many different offenses as meet the Blockburger test, we have long held that it must sometimes bring its prosecutions for these offenses together. If a separate prosecution were permitted for every offense arising out of the same conduct, the government could manipulate the definitions of offenses, creating fine distinctions among them and permitting a zealous prosecutor to try a person again and again for essentially the same criminal conduct. While punishing different combinations of elements is consistent with the Double Jeopardy Clause in its limitation on the imposition of multiple punishments (a limitation rooted in concerns with legislative intent), permitting such repeated prosecutions would not be consistent with the principles underlying the Clause in its limitation on successive *748 prosecutions. The limitation on successive prosecutions is thus a restriction on the government different in kind from that contained in the limitation on multiple punishments, and the government cannot get around the restriction on repeated prosecution of a single individual merely by precision in the way it defines its statutory offenses. Thus, "[t]he Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first." Brown, 432 U. S., at 166-167, n. 6.
An example will show why this should be so. Assume three crimes: robbery with a firearm, robbery in a dwelling, and simple robbery. The elements of the three crimes are the same, except that robbery with a firearm has the element that a firearm be used in the commission of the robbery while the other two crimes do not, and robbery in a dwelling has the element that the robbery occur in a dwelling while the other two crimes do not.
If a person committed a robbery in a dwelling with a firearm and was prosecuted for simple robbery, all agree he could not be prosecuted subsequently for either of the greater offenses of robbery with a firearm or robbery in a dwelling. Under the lens of Blockburger, however, if that same person were prosecuted first for robbery with a firearm, he could be prosecuted subsequently for robbery in a dwelling, even though he could not subsequently be prosecuted on the basis of that same robbery for simple robbery.[3] This is true simply because neither of the crimes, robbery *749 with a firearm and robbery in a dwelling, is either identical to or a lesser included offense of the other. But since the purpose of the Double Jeopardy Clause's protection against successive prosecutions is to prevent repeated trials in which a defendant will be forced to defend against the same charge again and again, and in which the government may perfect its presentation with dress rehearsal after dress rehearsal, it should be irrelevant that the second prosecution would require the defendant to defend himself not only from the charge that he committed the robbery, but also from the charge of some additional fact, in this case, that the scene of the crime was a dwelling.[4] If,instead, protection against successive prosecutions were as limited as it would be by Blockburger alone, the doctrine would be as striking for its anomalies as for the limited protection it would provide. Thus, in the relatively few successive prosecution cases we have had over the years, we have not held that the Blockburger test is the only hurdle the government must clear (with one exception, see infra, at 758-759).

IV
The recognition that a Blockburger rule is insufficient protection against successive prosecution can be seen as long ago as In re Nielsen, 131 U. S. 176 (1889), where we held that conviction for one statutory offense precluded later prosecution for another, even though each required proof of a fact the other did not. There, appellant Nielsen had been convicted after indictment and a guilty plea in what was then the Territory of Utah for "cohabit[ing] with more than one woman," based upon his cohabitation with Anna Lavinia *750 Nielsen and Caroline Nielsen during the period from October 15, 1885, to May 13, 1888, in violation of a federal antipolygamy law. See Act ofMar. 22, 1882, ch. 47,§ 3, 22 Stat. 31. Nielsen served his sentence of three months' imprisonment and paid a $100 fine. He then came to trial on a second indictment charging him under another federal antipolygamy law with committing adultery with Caroline Nielsen on the day following the period described in the first indictment, May 14, 1888, based on the fact that he was married and had a lawful wife, and was not married to Caroline Nielsen. See Act of Mar. 3, 1887, ch. 397, § 3, 24 Stat. 635. Nielsen pleaded former jeopardy to the second indictment, arguing first that the true period of the cohabitation charged in the first indictment extended well beyond May 13 until the day of the indictments, September 27, 1888, and that "the offence charged in both indictments was one and the same offence and not divisible." 131 U. S., at 178. The Government argued that the two crimes were not the same because the elements of the two offenses differed.
The Nielsen Court first considered the question whether the offense of unlawful cohabitation included, in a temporal sense, the single act of adultery subsequently prosecuted. On this question, the Court first noted, following In re Snow, 120 U. S. 274 (1887), that although the indictment for cohabitation listed May 13, 1888, as the end of that offense, cohabitation is a "`continuing offence . . . [that] canbe committed but once, for the purposes of indictment or prosecution, prior to the time the prosecution is instituted.' " 131 U. S., at 186 (quoting Snow, supra, at 282). Thus, the Nielsen Court interpreted the indictment for cohabitation as covering a single continuing offense that ended on the day the indictment was handed up. See 131 U. S., at 187.
Having concluded that the offense of cohabitation was a "continuous" one, "extending over the whole period, including the time when the adultery was alleged to have been committed," id., at 187, the Court then considered the question *751 whether double jeopardy applies where a defendant is first convicted of a continuing offense and then indicted for some single act that the continuing offense includes. The Court answered this question by quoting with approval an observation found in Morey v. Commonwealth, 108 Mass. 433 (1871), that "[a] conviction of being a common seller of intoxicating liquors has been held to bar a prosecution for a single sale of such liquors within the same time." Id., at 435. The Court then conceded that quoting this observation from the Morey opinion would not alone suffice to decide the case before it, since the Government was relying on a further statement from Morey, this one expressing the Morey court's reason for holding that a prior conviction on a charge of "lewdly and lasciviously associating" with an unmarried woman was no bar to a subsequent prosecution for adultery: "[A]lthough proof of the same acts of unlawful intercourse was introduced on both trials[,] . . . the evidence required to support the two indictments was not the same." 131 U. S., at 188. The Morey court's reasoning behind this holding was that "[a] single act may be an offence against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." 108 Mass., at 434, quoted in Nielsen, supra, at 188. Morey `s rule governing subsequent prosecution, in other words, was what we know today as the Blockburger elements test.
The Nielsen Court held the Blockburger test inapplicable for two reasons. First, it distinguished Morey by noting that "[t]he crime of loose and lascivious association . . . did not necessarily imply sexual intercourse," 131 U. S., at 188, while the continuous offense involved in Nielsen, cohabitation under the polygamy statute, required proof of "[l]iving together as man and wife," which "[o]f course" implies "sexual intercourse," even though intercourse need not have been pleaded or proven under a cohabitation indictment, id., at *752 187. (The second offense charged in both Morey and the case before the Court in Nielsen was adultery, which, of course, did require an act of sexual intercourse.) But even on the assumption that the continuous crime in Morey necessarily did imply sexual intercourse, rendering the cases indistinguishable on their facts, the Nielsen Court indicated that it would not follow the holding in Morey. To the Nielsen Court, it was "very clear that where, as in this case, a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence." 131 U. S., at 188.
By this last statement, the Court rejected, in a successive prosecution case, the double jeopardy test set out in Morey, which we later adopted in Blockburger ; instead of agreeing with Morey that "`[t]he test is not, whether the defendant has already been tried for the same act,' " the Court concluded that a defendant "cannot be a second time tried" for a single act included as one of the "various incidents" of a continuous crime for which he has already been convicted.[5] 131 U. S., at 188.
The Court then went on to address the contention that adultery, as opposed to sexual intercourse, is not an act included in the continuing offense of cohabitation, because *753 adultery requires proof that one of the parties is married, while cohabitation does not require such proof. Although the Court agreed that adultery contains such an element, the Court found that this element was irrelevant under its successive prosecution rule, because sexual intercourse is the "essential and principal ingredient of adultery." Id., at 189. In other words, what may not be successively prosecuted is the act constituting the "principal ingredient" of the second offense, if that act has already been the subject of the prior prosecution. It is beside the point that the subsequent offense is defined to include, in addition to that act, some further element uncommon to the first offense (where the first offense also includes an element not shared by the second). Thus, as the Court states its holding, the cohabitation conviction "was a good bar" because "the material part of the adultery charged [i. e., intercourse] was comprised within the unlawful cohabitation of which the petitioner was already convicted." Id., at 187 (emphasis supplied); see also ibid. (sexual intercourse "was the integral part of the adultery charged in the second indictment") (emphasis supplied).
One final aspect of the Nielsen opinion deserves attention. After rejecting a Blockburger test for successive prosecutions, the Court then proceeded to discuss the familiar rule that conviction of a greater offense bars subsequent prosecution for a lesser included offense. This discussion misleads the majority into thinking that Nielsen does nothing more than apply that familiar rule, which is, of course, a corollary to the Blockburger test. See ante, at 705. But Nielsen `s discussion did not proceed on the ground that the Court believed adultery to be a lesser included offense of cohabitation (and thus its later prosecution barred for that reason); on the contrary, the Court had just finished explaining that marriage must be proven for adultery, but not for cohabitation, which precluded finding adultery to be a lesser included offense of cohabitation. The discussion of the lesser included offense rule is apposite for the different reason that once the *754 element of marriage was disregarded (as the Court had just done, considering instead only adultery's "principal ingredient" of intercourse), the act of intercourse stood to cohabitation as a lesser included offense stands to the greater offense. By treating intercourse as though it were a lesser included offense, Nielsen barred subsequent prosecution for that act under an adultery charge. Indeed, on any other reading we would have to conclude that the Nielsen Court did not know what it was doing, for if it had been holding only that a subsequent prosecution for a lesser included offense was barred, the adultery prosecution would not have been. There can be no question that the Court was adopting the very different rule that subsequent prosecution is barred for any charge comprising an act that has been the subject of prior conviction.[6]

V
Our modern cases reflect the concerns that resulted in Nielsen `s holding. We have already quoted the observation that "[t]he Blockburger test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to permit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances where the second prosecution requires the relitigation of factual issues already resolved by the first." Brown v. Ohio, 432 U. S., at 166-167, n. 6. The Brown Court, indeed, relied on Nielsen for this proposition. "[I]n In re Nielsen, 131 U. S. 176 (1889), the Court held that a conviction of a Mormon on a charge of cohabiting with his two wives over a 2 12-year period barred a subsequent prosecution for adultery with one of them on the day following the end of that period . . . . [S]trict application of the Blockburger test would have permitted *755 imposition of consecutive sentences had the charges been consolidated in a single proceeding. . . . [C]onviction for adultery required proof that the defendant had sexual intercourse with one woman while married to another; conviction for cohabitation required proof that the defendant lived with more than one woman at the same time. Nonetheless, the Court . . . held the separate offenses to be the `same.' " Ibid. 
In the past 20 years the Court has addressed just this problem of successive prosecution on three occasions. In Harris v. Oklahoma, 433 U. S. 682 (1977) (per curiam), we held that prosecution for a robbery with firearms was barred by the Double Jeopardy Clause when the defendant had already been convicted of felony murder comprising the same robbery with firearms as the underlying felony. Of course the elements of the two offenses were different enough to permit more than one punishment under the Blockburger test: felony murder required the killing of a person by one engaged in the commission of a felony, see 21 Okla. Stat., Tit. 21, § 701 (1971); robbery with firearms required the use of a firearm in the commission of a robbery, see §§ 801, 791. Harris v. State, 555 P. 2d 76, 80 (Okla. Crim. App. 1976), rev'd, 433 U. S. 682 (1977).
In Harris, however, we held that "[w]hen, as here, conviction of a greater crime, murder, cannot be had without conviction of the lesser crime, robbery with firearms, the Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one." We justified that conclusion in the circumstances of the case by quoting Nielsen `s explanation of the Blockburger test's insufficiency for determining when a successive prosecution was barred. "`[A] person [who] has been tried and convicted for a crime which has various incidents included in it . . . cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence.' In re Nielsen, *756 [131 U. S.,] at 188." 433 U. S., at 682-683 (citations and footnote omitted).[7]
Just as in Nielsen, the analysis in Harris turned on considering the prior conviction in terms of the conduct actually charged. While that process might be viewed as a misapplication of a Blockburger lesser included offense analysis, the crucial point is that the Blockburger elements test would have produced a different result. The case thus follows the holding in Nielsen and conforms to the statement already quoted from Brown, that the Blockburger test is not the exclusive standard for determining whether the rule against successive prosecutions applies in a given case.
Subsequently, in Illinois v. Vitale, 447 U. S. 410 (1980), the Court again indicated that a valid claim of double jeopardy would not necessarily be defeated by the fact that the two offenses are not the "same" under the Blockburger test. In that case, we were confronted with a prosecution for failure to reduce speed and a subsequent prosecution for involuntary manslaughter. The opinion of the Illinois Supreme Court below had not made it clear whether the elements of failure to slow were always necessarily included within the elements of involuntary manslaughter by automobile, and we remanded for clarification of this point, among other things. We held that "[i]f, as a matter of Illinois law, a careless failure to slow is always a necessary element of manslaughter by automobile, then the two offenses are the `same' under Blockburger and Vitale's trial on the latter charge would constitute double jeopardy . . . ." 447 U. S., at 419-420. But that was not all. Writing for the Court, Justice White went on to say that, "[i]n any event, it may be that to sustain its manslaughter case the State may find it necessary *757 to prove a failure to slow or to rely on conduct necessarily involving such failure . . . . In that case, because Vitale has already been convicted for conduct that is a necessary element of the more serious crime for which he has been charged, his claim of double jeopardy would be substantial under Brown and our later decision in Harris v. Oklahoma, 433 U. S. 682 (1977)." Id., at 420.
Over a decade ago, then, we clearly understood Harris to stand for the proposition that when one has already been tried for a crime comprising certain conduct, a subsequent prosecution seeking to prove the same conduct is barred by the Double Jeopardy Clause.[8] This is in no way inconsistent with Vitale `s description of Harris as "treat[ing] a killing in the course of a robbery as itself a separate statutory offense, and the robbery as a species of lesser-included offense." 447 U. S., at 420. The very act of "treating" it that way was a departure from straight Blockburger analysis; it was the same departure taken by the Nielsen Court. Vitale read Harris (which itself quoted Nielsen ) to hold that even if the Blockburger test were satisfied, a second prosecution would not be permitted for conduct comprising the criminal act charged in the first. Nielsen and Harris used the word "incident," while Vitale used the word "conduct," but no matter which word is used to describe the unlawful activity for which one cannot again be forced to stand trial, the import of this successive-prosecution strand of our double jeopardy jurisprudence is clear.
Even if this had not been clear since the time of In re Nielsen, any debate should have been settled by our decision three Terms ago in Grady v. Corbin, 495 U. S. 508 (1990), *758 that "the Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted." Id., at 510 (footnote omitted). Grady did nothing more than apply a version of the Nielsen rule.
As against this sequence of consistent reasoning from Nielsen to Grady, the Court's citation to two cases, Gavieres v. United States, 220 U. S. 338, 343 (1911), and Burton v. United States, 202 U. S. 344, 379-381 (1906), cannot validate its insistence that, prior to Grady, our exclusive standard for barring successive prosecutions under the Double Jeopardy Clause was the Blockburger test. See ante, at 707-708. Burton came before the Court on a demurrer. The Court there was not presented with the factual basis for the charges, and simply held that two offenses, accepting a bribe from a company and accepting the same bribe from an officer of that company, were "not identical, in law." 202 U. S., at 381; see also id., at 379 ("[T]he question presented is whether, upon the face of the record, as matter of law simply, the offense charged in the third and seventh counts of the present indictment is the same as that charged in the third count of the former indictment") (emphasis in original); Abbate v. United States, 359 U. S. 187, 198, n. 2 (1959) (opinion of Brennan, J.). Rather than proving that the Blockburger same-elements test was always the Court's exclusive guide to evaluation of successive prosecutions prior to Grady, Burton stands only for the proposition that a claim of double jeopardy resting exclusively on pleadings cannot be adjudicated on any basis except the elements pleaded.
Gavieres is in fact the only case that may even be read to suggest that the Court ever treated a Blockburger analysis as the exclusive successive prosecution test under the Double Jeopardy Clause, and its precedential force is weak. Gavieres was an interpretation not of the Constitution, but *759 of an Act of Congress applicable to the Philippines, providing that "no person for the same offense shall be twice put in jeopardy of punishment." Act of July 1, 1902, ch. 1369, § 5, 32 Stat. 692. It is true that in his opinion for the Court in Gavieres, Justice Day wrote that we had held in Kepner v. United States, 195 U. S. 100 (1904), "that the protection against double jeopardy therein provided had, by means of this statute, been carried to the Philippine Islands in the sense and in the meaning which it had obtained under the Constitution and laws of the United States." 220 U. S., at 341. Nonetheless, this Court has declined to treat decisions under that statute as authoritative constructions of the Fifth Amendment. See Green v. United States, 355 U. S., at 197, and n. 16; see also Abbate , supra, at 198, n. 2 (opinion of Brennan, J.).

VI
Burton and Gavieres thus lend no support for the Court's decision to overrule Grady and constrict Harris. Whatever may have been the merits of the debate in Grady, the decision deserves more respect than it receives from the Court today. "Although adherence to precedent is not rigidly required in constitutional cases, any departure from the doctrine of stare decisis demands special justification. See, e. g., Swift & Co. v. Wickham, 382 U. S. 111, 116 (1965); Smith v. Allwright, 321 U. S. 649, 665 (1944)." Arizona v. Rumsey, 467 U. S. 203, 212 (1984).
The search for any justification fails to reveal that Grady `s conclusion was either "unsound in principle," or "unworkable in practice." Garcia v. San Antonio Metropolitan Transit Authority, 469 U. S. 528, 546 (1985). Grady `s rule is straightforward, and a departure from it is not justified by the fact that two Court of Appeals decisions have described it as difficult to apply, see ante, at 711-712, n. 16, one apparently because it must be distinguished from the "same evidence" test, see Ladner v. Smith, 941 F. 2d 356, 363-364 (CA5 1991). Nor does the fact that one of those courts has *760 broken the single sentence of Grady `s holding into its four constituent clauses before applying it, see Ladner, supra, reveal a type of "`confusion,' " ante, at 711 (citation omitted), that can somehow obviate our obligation to adhere to precedent. Cf. Patterson v. McLean Credit Union, 491 U. S. 164, 173-174 (1989).
Nor do Burton and Gavieres have the strength to justify the Court's reading of Harris solely for the narrow proposition that, in a case where a statute refers to other offenses, the elements of those offenses are incorporated by reference in the statute.[9] While reading the case this way might suffice for purposes of avoiding multiple punishment, this reading would work an unprecedented truncation of the protection afforded by the Double Jeopardy Clause against successive prosecutions, by transferring the government's leeway in determining how many offenses to create to the assessment of how many times a person may be prosecuted for the same conduct. The Double Jeopardy Clause then would provide no more protection against successive prosecutions than it provides against multiple punishments, and instead of expressing some principle underlying the protection against double jeopardy, Harris would be an anomaly, an "exceptio[n]" to Blockburger without principled justification. Grady, 495 U. S., at 528 (Scalia, J., dissenting). By relying on that anomaly and by defining its offenses with care, the government could not merely add punishment to *761 punishment (within Eighth and Fourteenth Amendment limits), but could bring a person to trial again and again for that same conduct, violating the principle of finality, subjecting him repeatedly to all the burdens of trial, rehearsing its prosecution, and increasing the risk of erroneous conviction, all in contravention of the principles behind the protection from successive prosecutions included in the Fifth Amendment. The protection of the Double Jeopardy Clause against successive prosecutions is not so fragile that it can be avoided by finely drafted statutes and carefully planned prosecutions.

VII
I would not invite any such consequences and would here apply our successive prosecution decisions (from Nielsen to Grady ) to conclude that the prosecutions below were barred by the Double Jeopardy Clause. Dixon was prosecuted for violating a court order to "[r]efrain from committing any criminal offense." App. 8. The contempt prosecution proved beyond a reasonable doubt that he had possessed cocaine with intent to distribute it. His prosecution, therefore, for possession with intent to distribute cocaine based on the same incident is barred. It is of course true that the elements of the two offenses can be treated as different. In the contempt conviction, the Government had to prove knowledge of the court order as well as Dixon's commission of some criminal offense. In the subsequent prosecution, the Government would have to prove possession of cocaine with intent to distribute. In any event, because the Government has already prosecuted Dixon for the possession of cocaine at issue here, Dixon cannot be tried for that incident a second time.[10]
*762 Foster was subject to a Civil Protection Order (CPO) not to "molest, assault, or in any manner threaten or physically abuse" his wife, Ana Foster. App. 18. With respect to the period in which the CPO was in effect, Foster was alleged to have violated it (in incidents relevant here) by (1) "grabbing [Ms. Foster] and thr[owing] her against a parked car," on November 6, 1987, by threatening her on (2) November 12, 1987, (3) March 26, 1988, and (4) May 17, 1988, and by (5) throwing her down basement stairs, kicking her and hitting her head against the floor until she lost consciousness, on May 21, 1988. These incidents formed the basis for charging Foster with contempt of court for violation of the CPO. Foster was found guilty of violating the court order by assaulting Ana Foster on November 6, 1987, and May 21, 1988. He was found not guilty of the threats on November 12, 1987, March 26, 1988, and May 17, 1988.
The Government then sought to prosecute Foster for these same threats and assaults, charging him in a five-count indictment with violations of the D. C. Code. Count I charged him with simple assault on November 6, 1987. Since he has already been convicted of this assault, the second prosecution is barred. The Court agrees with this under its reading of Harris, but would distinguish the other counts: Counts II, III, and IV (based on the same threats alleged in the contempt proceeding) charging Foster with "threaten[ing] to injure the person of Ana Foster . . . , in violation of 22 D. C. Code, Section 2307" (which prohibits threats to kidnap, to do bodily injury, or to damage property); and Count V, charging Foster with "assaul[t] . . . with intent to kill" as a result of his actions on May 21, 1988. App. 43-44. The Court concludes that the later prosecutions are not barred, because in its view the offenses charged in the indictment each contained an element not contained in the contempt charge (with respect to the threats, that they be threats to kidnap, to inflict bodily injury, or to damage property; with respect to the assault, that it be undertaken with an intent to kill); and *763 because the contempt charge contained an element not specified by the criminal code sections that formed the basis for the indictment (violation of the CPO). See ante, at 700-703.[11]
In each instance, however, the second prosecution is barred under Nielsen, Harris as we construed it in Vitale, and Grady. The conduct at issue constituted the conduct in the contempts first charged as well as in the crimes subsequently prosecuted, and the Government's prosecution of Foster twice for the conduct common to both would violate the Double Jeopardy Clause.

VIII
Grady simply applied a rule with roots in our cases going back well over 100 years. Nielsen held that the Double Jeopardy Clause bars successive prosecutions for more than one statutory offense where the charges comprise the same act, and Harris, as understood in Vitale, is properly read as standing for the same rule. Overruling Grady alone cannot remove this principle from our constitutional jurisprudence. Only by uprooting the entire sequence of cases, Grady, Vitale, Harris, and Nielsen, could this constitutional principle be undone. Because I would not do that, I would affirm the judgment of the Court of Appeals. I concur in the judgment of the Court in Dixon and with respect to Count I in Foster, but respectfully dissent from the disposition of the case with respect to Counts IIV in Foster. 
NOTES
[*] Clifton S. Elgarten, Susan M. Hoffman, Susan Deller Ross, Naomi Cahn, Laura Foggan, and Catherine F. Klein filed a brief for Ayuda et al. as amici curiae urging reversal.
[1] was Commentaries *280*285. That limitation closely followed in American courts. See United States v. Hudson, 7 Cranch 32, 34 (1812); R. Goldfarb, The Contempt Power 12-20 (1963). Federal courts had power to "inforce the observance of order," but those "implied powers" could not support common-law jurisdiction over criminal acts. Hudson, supra, at 34. In 1831, Congress amended the Judiciary Act of 1789, allowing federal courts the summary contempt power to punish generally "disobedience or resistance" to court orders. § 1, Act of March 2, 1831, 4 Stat. 487-488. See Bloom v. Illinois, 391 U. S. 194, 202-204 (1968) (discussing evolution of federal courts' statutory contempt power).
[2] State v. Yancy, 4 N. C. 133 (1814), it should be noted, involved what is today called summary contempt. We have not held, and do not mean by this example to decide, that the double jeopardy guarantee applies to such proceedings.
[3] In order for the same analysis to be applicable to violation of a statute criminalizing disobedience of a lawful police order, as The Chief Justice's dissent on this point hypothesizes, see post, at 719, the statute must embrace police "orders" that "command" the noncommission of crimes for instance, "Don't shoot that man!" It seems to us unlikely that a "police order" statute would be interpreted in this fashion, rather than as addressing new obligations imposed by lawful order of police (for example, the obligation to remain behind police lines, or to heed a command to "Freeze!"). If, however, such a statute were interpreted to cover police orders forbidding crimes, the Double Jeopardy Clause would as a practical matter bar subsequent prosecution only for relatively minor offenses, such as assault (the only conceivable lesser included offense of an order not to "shoot")unless one assumes that constables often order the noncommission of serious crimes (for example, "Don't murder that man!") and that serious felons such as murderers are first prosecuted for disobeying police orders.
[4] It is not obvious that the word "assault" in the CPO bore the precise meaning "assault under § 22-504." The court imposing the contempt construed it that way, however, and the point has not been contested in this litigation.
[5] Justice White complains that this section of our opinion gives the arguments of the United States "short shrift," post, at 720, and treats them in "conclusory" fashion, post, at 721. He then proceeds to reject these arguments, largely by agreeing with our analysis, post, at 721, 722, 724, 726. We think it unnecessary, and indeed undesirable, to address at any greater length than we have arguments based on dictum and inapplicable doctrines such as dual sovereignty. The remainder of that part of Justice White's opinion that deals with this issue arguesby no means in conclusory fashionthat its practical consequences for law enforcement are not serious. Post, at 727-731. He may be right. But we do not share his "pragmatic" view, post, at 739, that the meaning of the Double Jeopardy Clause depends upon our approval of its consequences.
[6] Given this requirement of willful violation of the order, Justice White's desire to "put to the side the CPO," because it only "triggered the court's authority" cannot be reconciled with his desire to "compar[e] the substantive offenses of which respondents stood accused." Post, at 734. The "substantive offense" of criminal contempt is willful violation of a court order. Far from a mere jurisdictional device, that order (or CPO) is the centerpiece of the entire proceeding. Its terms define the prohibited conduct, its existence supports imposition of a criminal penalty, and willful violation of it is necessary for conviction. To ignore the CPO when determining whether two offenses are the "same" is no more possible than putting aside the statutory definitions of criminal offenses. Of course, Justice White's view that the elements of criminal contempt are essentially irrelevant for double jeopardy analysis does have precedent albeit erroneousin Grady `s same-conduct test. Grady v. Corbin, 495 U. S. 508 (1990). Justice Souter also ignores the knowledge element. Post, at 761, n. 10.
[7] We accept, as we ordinarily do, the construction of a District of Columbia law adopted by the District of Columbia Court of Appeals. See, e. g., Pernell v. Southall Realty, 416 U. S. 363, 368-369 (1974). The construction here has sound support in the text of the statute. Compare D. C. Code Ann. § 22-501 (1989) (assault with intent to kill, rob, rape, or poison) with § 22-504 (assault).
[8] Justice White's suggestion, post, at 737-738, that if Foster received a lesser-included-offense instruction on assault at his trial for assault with intent to kill, we would uphold a conviction on that lesser count is simply wrong. Under basic Blockburger analysis, Foster may neither be tried a second time for assault nor again convicted for assault, as we have concluded as to Count I (charging simple assault). Thus, Foster certainly does receive the "full constitutional protection to which he is entitled," post, at 738, n. 10: he may neither be tried nor convicted a second time for assault. That does not affect the conclusion that trial and conviction for assault with intent to kill are not barred. It merely illustrates the unremarkable fact that one offense (simple assault) may be an included offense of two offenses (violation of the CPO for assault, and assault with intent to kill) that are separate offenses under Blockburger. 
[9] We think it is highly artificial to interpret the CPO's prohibition of threatening "in any manner," as Justice White would interpret it, to refer only to threats that violate the District's criminal laws. Post, at 732-733, n. 7. The only threats meeting that definition would have been threats to do physical harm, to kidnap, or to damage property. See D. C. Code Ann. §§ 22-507, 22-2307 (1989). Threats to stalk, to frighten, to cause intentional embarrassment, to make harassing phone calls, to make false reports to employers or prospective employers, to harass by phone calls or otherwise at workto mention only a few of the additional threats that might be anticipated in this domestic situationwould not be covered. Surely "in any manner threaten" should cover at least all threats to commit acts that would be tortious under District of Columbia law (which would be consistent with the trial court's later reference to a "legal threat"). Thus, under our Blockburger analysis the aggravated threat counts and the assault-with-intent-to-kill count come out the same way.
[10] Justice White attempts to avoid this issue altogether because, in his view, it would be "injudicious" to consider the differences in Foster, not pressed by the Government, between the CPO restrictions and the alleged statutory offenses. Post, at 740. Of course, these differences are pure facts, apparent on the face of the CPO and the indictment. They do not alter the question presented, which assumes only that the prosecuted conduct was the same, see supra, at 694, not that the terms of the CPO and the statute were. Further, although the Government did not argue that the different counts in Foster should come out differently, it did argue (as we do) that they all should be evaluated under Blockburger and not Grady, see, e. g., Brief for United States 14-15, 42; and we are not aware of any principle that prevents us from accepting a litigant's legal theory unless we agree with the litigant on all the applications of the theory. The standard to be applied in determining the double jeopardy effect of criminal charges based on the same conduct (Blockburger vs. Grady ) assuredly is included within the question presented. That makes Justice White's citation of cases declining to consider legal issues not raised below wholly beside the point. Nor can we see any abuse of what Justice White himself regards as a prudential limitation, when the evident factual difference between the charges and the CPO order is central to proper constitutional analysis.
[11] Justice Souter has apparently been led astray by his misinterpretation of the word "incidents" in the following passage of Nielsen: "[W]here, as in this case, a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence." 131 U. S., at 188. He apparently takes "incident" to mean "event" or "conduct." See post, at 752, and n. 5, 757-758. What it obviously means, however, is "element." See Black's Law Dictionary 762 (6th ed. 1990) (defining "incidents of ownership"); J. Bouvier, Law Dictionary 783-784 (1883) (defining "incident" and giving examples of "incident to a reversion," and "incidents" to a contract). That is perfectly clear from the very next sentence of Nielsen (which Justice Souter does not quote): "It may be contended that adultery is not an incident of unlawful cohabitation . . . ."131 U. S.,at 189.
[12] There is, for example, no other way to read the following passage in Illinois v. Vitale, quoted by Justice Souter, post, at 757: "[In Harris ] we treated a killing in the course of a robbery as itself a separate statutory offense, and the robbery as a species of lesser-included offense." 447 U. S. 410, 420 (1980).
[13] Justice Souter contends that Burton is not in point because the case arose on a demurrer to the indictment, so that the Court "was not presented with the factual basis for the charges." Post, at 758. It would be a rare and unsatisfactory indictment that did not set forth the factual basis for the charges. The Court in Burton discusses the facts at length. 202 U. S., at 379-381. It is obvious, and it was assumed by the Court, that the same conduct was at issue in both indictments. Having decided, pursuant to Blockburger, that the nature of the statutes did not support a claim of double jeopardy, the Court (if it agreed with Justice Souter's view of the law) should have proceeded to consider whether the nature of the acts alleged supported such a claim.
[14] Both Justice White, post, at 735, and Justice Souter, post, at 758 759, recognize that Gavieres did hold that Blockburger is the only test for "same offence." Justice Souter handles this difficulty by simply ignoring the concession. See ibid. Justice White first minimizes the concession, arguing that application of our version of Blockburger to successive prosecutions has happened (by reason of Gavieres ) "only once." Post, at 735. Once, it seems to us, is enough to make a precedent. Justice White then seeks to neutralize the precedent by offering stillanother case, Grafton v. United States, 206 U. S. 333 (1907), that cannot support the reading grafted onto it today. Post, at 739-740. The defendant in Grafton was first tried and acquitted by a military court for the offense of homicide, and then tried by a civilian criminal court for assassination, and convicted of homicide, based on the same conduct. 206 U. S.,at 349. The second prosecution was held barred by the Double Jeopardy Clause. Justice White argues that, just as Grafton had to be a soldier for the military court to have jurisdiction, so too here the only relevance of the CPO is that it gave the court authority to punish offenses "already prescribed by the criminal law." Post, at 740. This description does not accurately portray the threat counts, see n. 8, supra but the problem with Justice White's analysis is deeper than that. The substantive offense for which Grafton was first tried (violation of Philippines Penal Code Article 404) did not have as one of its elements status as a soldier, whereas the substantive offense for which Foster was first tried did have as one of its elements knowledge of an extant CPO. See supra, at 700-702. Since military status was not an element of Grafton's charged offense, it is not true that our analysis would produce a result contrary to the opinion in Grafton. Under the traditional Blockburger elements test, assassination, as defined in Article 403 of the Philippines Penal Code, contained an element that homicide, as defined in Article 404, did not; but, as the Court noted, homicide did not contain any element not included in assassination. 206 U. S., at 350 ("One crime may be a constituent part of the other"); accord, id., at 355 (he "could not subsequently be tried for the same offense"). Grafton could therefore not later be prosecuted for assassination, much less later be convicted for the very same homicide offense of which he had been acquitted. (In fact, Grafton may simply have been decided on grounds of collateral estoppel, see id., at 349-351, an issue that we specifically decline to reach in this case, see n. 17, infra. )
[15] It is unclear what definition of "same offence" Justice Souter would have us adopt for successive prosecution. At times, he appears content with our having added to Blockburger the Grady same-conduct test. At other times, however, he adopts an ultra-Grady "same transaction" rule, which would require the Government to try together all offenses (regardless of the differences in the statutes) based on one event. See post, at 747, 761. Of course, the same-transaction test, long espoused by Justice Brennan, see, e. g., Brown v. Ohio, 432 U. S. 161, 170 (1977) (concurring opinion), has been consistently rejected by the Court. See, e. g., Garrett v. United States, 471 U. S. 773, 790 (1985).
[16] Justice Souter dislikes this result because it violates "the principles behind the protection from successive prosecutions included in the Fifth Amendment." Post, at 761. The "principles behind" the Fifth Amendment are more likely to be honored by following longstanding practice than by following intuition. But in any case, Justice Souter's concern that prosecutors will bring separate prosecutions in order to perfect their case seems unjustified. They have little to gain and much to lose from such a strategy. Under Ashe v. Swenson, 397 U. S. 436 (1970), an acquittal in the first prosecution might well bar litigation of certain facts essential to the second onethough a conviction in the first prosecution would not excuse the Government from proving the same facts the second time. Surely, moreover, the Government must be deterred from abusive, repeated prosecutions of a single offender for similar offenses by the sheer press of other demands upon prosecutorial and judicial resources. Finally, even if Justice Souter's fear were well founded, no double jeopardy bar short of a same-transaction analysis will eliminate this problem; but that interpretation of the Double Jeopardy Clause has been soundly rejected, see, e. g., Garrett, supra, and would require overruling numerous precedents, the latest of which is barely a year old, United States v. Felix, 503 U. S. 378 (1992).
[17] See, e. g., Sharpton v. Turner, 964 F. 2d 1284, 1287 (CA2) (Grady formulation "has proven difficult to apply" and "whatever difficulties we have previously encountered in grappling with the Grady language have not been eased by" Felix ), cert. denied, 506 U. S. 986 (1992); Ladner v. Smith, 941 F. 2d 356, 362, 364 (CA5 1991) (a divided court adopts a four-part test for application of Grady and notes that Grady, "even if carefully analyzed and painstakingly administered, is not easy to apply"), cert. denied, 503 U. S. 983 (1992); United States v. Calderone, 917 F. 2d 717 (CA2 1990) (divided court issues three opinions construing Grady ), vacated and remanded, 503 U. S. 978 (1992) (remanded for consideration in light of Felix ); United States v. Prusan, 780 F. Supp. 1431, 1434-1436 (SDNY 1991) ("[T]he lower courts have had difficulty discerning the precise boundaries of the Grady standard, and the circuits have not applied uniformly the `same conduct' test"), rev'd, 967 F. 2d 57 (CA2), cert. denied sub nom. Vives v. United States, 506 U. S. 987 (1992); State v. Woodfork, 239 Neb. 720, 725, 478 N. W. 2d 248, 252 (1991) (divided court overrules year-old precedent construing Grady, because it was a "misapplication" of Grady ); Eatherton v. State, 810 P. 2d 93, 99, 104 (Wyo. 1991) (majority states that "[t]he Supreme Court did not really develop any new law in Grady with respect to successive prosecutions," while dissent concludes that Grady requires reversal).Commentators have confirmed that Grady contributed confusion rather than certainty.See Poulin, Double Jeopardy Protectionagainst Successive Prosecutions in Complex Criminal Cases:A Model, 25 Conn. L. Rev. 95 (1992); Thomas, A Modest Proposal to Save the Double Jeopardy Clause, 69 Wash. U. L. Q. 195 (1991).
[18] We do not address the motion to dismiss the threat counts based on collateral estoppel, see Ashe v. Swenson, supra, because neitherlower court ruled on that issue.
[19] Justices White, Stevens, and Souter concur in this portion of the judgment.
[1] Justice Blackmun concurs only in the judgment with respect to this portion.
[2] Justice Scalia suggests that the dicta in those earlier cases are of limited value in light of Bloom v. Illinois, 391 U. S. 194 (1968), which held that the Sixth Amendment right to a jury trial applies to nonsummary contempt prosecutions. But there is simply no reason to think that the dicta in those cases were based on the understanding that prosecutions for contempt were not subject to the Double Jeopardy Clause. Rather, the principal theme running through the pre-Grady cases is that, while nonsummary contempt is a criminal prosecution, that prosecution and the later one for a substantive offense involve two separate and distinct offenses.
[3] The Court's discussion of the use of the contempt power at common law and in 19th-century America, see ante, at 694-695, does not undercut the relevance of these later, pre-Grady decisionsmost of which are from the late 20th centuryto the instant case.
[1] Assuming, arguendo, that Justice Scalia's reading of Harris v. Oklahoma, 433 U. S. 682 (1977), is accurate, and that we must look to the terms of the particular court orders involved, I believe Justice Scalia is correct in differentiating among the various counts in Foster. The court order there provided that Foster must "`not molest, assault, or in any manner threaten or physically abuse' " his estranged wife. App. to Pet. for Cert. 4a. For Foster to be found in contempt of court, his wife need have proved only that he had knowledge of the court order and that he assaulted or threatened her, but not that he assaulted her with intent to kill (Count V) or that he threatened to inflict bodily harm (Counts IIIV). So the crime of criminal contempt in Foster, even if analyzed under Justice Scalia's reading of Harris, is nonetheless a different offense under Blockburger v. United States, 284 U. S. 299 (1932), than the crimes alleged in Counts IIV of the indictment, since "each provision requires proof of a fact which the other does not." Id., at 304. Because Justice Scalia finds no double jeopardy bar with respect to those counts, I agree with the result reached in Part IIIB of his opinion.
[2] The distinction between, on the one hand, direct and summary contempt (i. e., contempt for acts occurring in the courtroom and interfering with the orderly conduct of business), and, on the other, nonsummary contempt, possesses old roots in the Court's cases. See United States v. Wilson, 421 U. S. 309 (1975); Cammer v. United States, 350 U. S. 399 (1956); Nye v. United States, 313 U. S. 33, 47-52 (1941); Cooke v. United States, 267 U. S. 517, 537 (1925); In re Savin, 131 U. S. 267 (1889); Ex parte Terry, 128 U. S. 289 (1888). See also Fed. Rule Crim. Proc. 42(a). Significantly, some courts have relied on this division to allow retrial on substantive criminal charges after a summary contempt proceeding based on the same conduct. See, e. g., United States v.Rollerson, 145 U. S. App. D. C. 338, 343, n. 13, 449 F. 2d 1000, 1005, n. 13 (1971); United States v. Mirra, 220 F. Supp. 361 (SDNY 1963). The argument goes as follows: Because summary proceedings do not really involve adversary proceedings, see Cooke, supra, they do not raise typical double jeopardy concerns and the defendant is not being subjected to successive trials. The instant cases deal exclusively with nonsummary contempt trials.
[3] It also is worth noting that sentences for contumacious conduct can be quite severe. Under federal law, there is no statutory limit to the sentence that can be imposed in a jury-tried criminal contempt proceeding. See 18 U. S. C. § 401. The same is true in the District of Columbia. See D. C. Code Ann. § 11-944 (Supp. 1992); see also Caldwell v. United States, 595 A. 2d 961, 964-966 (D. C. 1991). Significantly, some courts have found no bar to the imposition of a prison sentence for contempt even where the court order that was transgressed was an injunction against violation of a statute that itself did not provide for imprisonment as a penalty. See, e. g., United States v. Quade, 563 F. 2d 375, 379 (CA8 1977), cert. denied, 434 U. S. 1064 (1978); Mitchell v. Fiore, 470 F. 2d 1149, 1154 (CA3 1972), cert. denied, 411 U. S. 938 (1973); United States v. Fidanian, 465 F. 2d 755, 757-758 (CA5), cert. denied, 409 U. S. 1044 (1972).
[4] That the contempt proceeding was brought and prosecuted by a private party in Foster is immaterial. For "[p]rivate attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated.As we said in Gompers, criminal contempt proceedings arising out of civil litigation `arebetween the public and the defendant ... .' 221 U. S.,at 445." Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787, 804 (1987).
[5] Like Justice Scalia, I take no positions to the application of the Double Jeopardy Clause to conduct warranting summary contempt proceedings. See ante, at 697, n. 1. In different circumstances, the Court has recognized exceptions to the policy of avoiding multiple trials where "`there is a manifest necessity.' "United States v. Wilson, 420 U. S. 332, 344 (1975) (quoting United States v. Perez, 9 Wheat. 579, 580 (1824)).
[6] The laws of different jurisdictions make such alternatives more or less available but that, ofcourse, can have no bearing on the constitutional requirements we recognize today. In the District of Columbia, D. C. Code Ann. § 23-1329 (1989) contemplates both revocation of release and an order of detention in the event a condition of release has been violated. Also, trial court judges possess the authority to modify pretrial bail.See D. C. Code Ann. § 23-1321(f) (1989); Clotterbuck v. United States, 459 A. 2d 134 (D. C. 1983). Federal provisions are similar. Thus, 18 U. S. C.§ 3148(a) provides that "[a] person who has been released [pending trial], and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court."
[7] In response, amici emphasize that many motions are brought by women who proceed pro se and are not familiar with the minutiae of double jeopardy law. Brief for Ayuda et al. as Amici Curiae 26. The point iswell taken. But the problem should be addressed by such means as adequately informing pro se litigants,not by disregarding the Double Jeopardy Clause.
[8] Justice Scalia disputes this description of the Civil Protection Order (CPO). He questions whether the word "`assault' " meant "`assault under § 22-504,' " ante, at 700, n. 3, but defers to the contempt court's interpretation, and notes that the parties have not challenged this point. Ibid. He also disagrees that the reference to "threats" was to threats "that violate the District's criminal laws." Ante, at 702-703, n. 8. Indeed, given the contexta "domestic situation"he finds this construction "highly artificial." Ibid. But that, too, is how the court applying the court order appears to have understood it. Responding to the very argument made here by Justice Scalianamely that the "context of domestic violence" somehow stretched the meaning of "threat," Tr. in Nos. IF-630-87, IF 631-87 (Aug. 8, 1988), p. 315the court asserted that "in a criminal case, the defendant is entitled to more specific notice of the nature of the charge." Id. , at 316. Significantly, in acquitting Foster with respect to the threat allegedly made on November 12, 1987, the court stated that it was "not satisfied if those words as such, in spite of the context of this dispute, constitutes a legal threat." Ibid. (emphasis added). For the same reason that the court concluded that the word "assault" referred to the District's criminal provisions, it decided that the CPO's reference to "threats" was to "legal" threatsi. e., threats as defined by the law. Moreover, I note that the Government's presentation of this case coincides with this view. See Brief for United States 26 (describing the order not to "assault or in any manner threaten" as "direct[ing] Foster . . . to refrain from engaging in criminal conduct").

In any event, even assuming that the prohibition in the court order referred to threats other than those already outlawed, that should not change the outcome of this case. The offense prohibited in the CPOto threaten "in any manner"at the very least is "an incident and part of," In re Nielsen, 131 U. S. 176, 187 (1889),the offense of criminal threat defined in § 22-2307. Therefore, for reasons explained below, prosecution for one should preclude subsequent prosecution for the other.
[9] Therefore, I obviously disagree with The Chief Justice's Blockburger analysis which would require overruling not only Grady v. Corbin, 495 U. S. 508 (1990), but, as Justice Scalia explains, Harris v.Oklahoma, 433 U. S. 682 (1977), as well. See ante, at 698. At the very least, where conviction of the crime of contempt cannot be had without conviction of a statutory crime forbidden by court order, the Double Jeopardy Clause bars prosecution for the latter after acquittal or conviction of the former.
[10] Similar results follow, of course, from The Chief Justice's interpretation of the Clause.
[1] Justice Scalia's dismissal of this concern is difficult to follow. As I understand it, he maintains that no double jeopardy problem exists because under Blockburger a conviction for assault would not be upheld. See ante, at 702, n. 7. I suppose that the judge could upon request instruct the jury on the lesser included offense and await its verdict; if it were to find Foster guilty of simple assault, the court could then vacate the conviction as violative of the Double Jeopardy Clauseor, barring that, Foster could appeal his conviction on that basis. The sheer oddity of this scenario aside, it falls short of providing Foster with the full constitutional protection to which he is entitled. A double jeopardy violation occurs at the inception of trial, which is why an order denying a motion to dismiss on double jeopardy grounds is immediately appealable. See Abney v. United States, 431 U. S. 651 (1977). As we explained in that case: "[T]he Double Jeopardy Clause protects an individual against more than being subjected to double punishments. It is a guarantee against being twice put to trial for the same offense." Id. , at 660-661. In light of the lesser included offense instructions, and the associated risk of conviction for that offense, Foster would have to defend himself in his second trial once more against the charge of simple assault, thereby undergoing the "personal strain, public embarrassment, and expense of a criminal trial." Id. , at 661. Even if the conviction were set aside, he still would have "been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit." Id. , at 662. Indeed, I would have imagined that Justice Scalia would agree. As he recently wrote: "Since the Double Jeopardy Clause protects the defendant from being `twice put in jeopardy,' i. e., made to stand trial . . .for the `same offence,' it presupposes that sameness can be determined before the second trial. Otherwise, the Clause would have prohibited a second `conviction' or `sentence' for the same offense." Grady, 495 U. S., at 529 (dissenting opinion) (emphasis added). This double jeopardy predicament, of course, could be avoided by Foster's attorney not requesting the lesser included offense instructions to which his client is entitled.But to place a defendant before such a choice hardly strikes me as a satisfactory resolution.
[2] Consequently, I concur in the Court's judgment with respect to Dixon's prosecution and the prosecution of Foster under Count I of the indictment against him.
[3] For purposes of this case I need express no view on this question, whether the proscription of punishment for state-law offenses that fail the Blockburger test can somehow be overcome by a clearly shown legislative intent that they be punished separately. See Albernaz v. United States, 450 U. S. 333, 344-345 (1981) (Stewart, J., concurring in judgment).
[4] Our cases have long made clear that the order in which one is prosecuted for two crimes alleged to be the same matters not in demonstrating a violation of double jeopardy. See Brown v. Ohio, 432 U. S. 161, 168 (1977) ("[T]he sequence is immaterial").
[5] The irrelevance of additional elements can be seen in the fact that, as every Member of the Court agrees, the Double Jeopardy Clause does provide protection not merely against prosecution a second time for literally the same offense, but also against prosecution for greater offenses in which the first crime was lesser included, offenses that by definition require proof of one or more additional elements.
[6] Citing dictionary definitions, the majority claims that "incident," as used in this passage, "obviously" means "element." Ante, at 705, n. 10. This explanation does not make sense, for a defendant is not "tried for" an "element"; a defendant may be "tried for" a crime, such as adultery, that contains certain elements, or may be "tried for" certain acts. The immediate context of this passage from Nielsen indicates that these latter definitions of "incident" are intended. See, e. g., 131 U. S., at 188 ("`tried for the same act' "). The point is nailed down by the Court's discussion of intercourse as an "incident" of cohabitation, id., at 189, after having indicated that intercourse need not be pleaded or proven under a cohabitation indictment, id., at 187; if "incident" did mean "element," pleading and proof of intercourse would, of course, have been required. "Incident" here clearly means "act."
[7] Our cases, of course, hold that the same protection inheres after an acquittal. See North Carolina v. Pearce, 395 U. S. 711, 717 (1969).
[8] In Brown we recognized that "[a]n exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence." 432 U. S., at 169, n. 7.
[9] It is true that in light of its decision to remand the case to provide the State further opportunity to put forward some other basis for its prosecution, the Vitale Court, appropriately, described the claim only as "substantial." The important point, however, is the way in which the Court in Vitale (and, for that matter, the dissent in that case, see 447 U. S., at 426 (opinion of Stevens, J.)) read the Harris opinion.
[10] Indeed, at least where the common elements of the offenses themselves describe a separate criminal offense, the Court's reading of Harris v. Oklahoma, 433 U. S. 682 (1977), is apparently inconsistent even with the historical understanding of the Clause put forward by three of the dissenters in Grady. See Grady v. Corbin, 495 U. S. 508, 531 (1990) (Scalia, J., dissenting) (quoting 1 T. Starkie, Criminal Pleading, ch. xix, pp. 322-323 (2d ed. 1822)) ("`[I]f one charge consist of the circumstances A. B. C. and another of the circumstances A. D. E. then, if the circumstance which belongs to them in common does not of itself constitute a distinct substantive offence, an acquittal from the one charge cannot include an acquittal of the other' ") (emphasis supplied).
[11] I agree, therefore, with Justice White that the element of knowledge of a court order is irrelevant for double jeopardy purposes. See ante, at 734 (opinion concurring in judgment in part and dissenting in part).
[] I note that atleast the charge concerning assault with intent to kill would apparently have been barred under the approach taken in Justice Scalia's dissenting opinion in Grady. See n. 9, supra.