STATE of Texas, Appellant,

v.

Katherine Sue JACKSON, Appellee.

No. 11–00–00288–CR.

Court of Appeals of Texas,
Eastland.

April 25, 2002.

James Eidson, Criminal District Attorney, Kollin Shadle, Appellate Section, Criminal District Attorney's Office, Abilene, for appellant.

Lynn Ingalsbe, Abilene, for appellee.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

Opinion

W.G. ARNOT, III, Chief Justice.

Saying that she was angry and needed to vent, Katherine Sue Jackson entered the emergency room of Hendrick Hospital with a loaded gun and confronted Dr. Michael McAuliffe. In the ensuing struggle, Jackson fired the gun before she could be subdued. Jackson had a history of aberrant behavior toward and stalking of Dr. McAuliffe, whom she accused of being the father of her child. Dr. McAuliffe had repeatedly proven biologically that he was not the child's father.

A district court in Austin, Texas had previously placed Jackson under a temporary injunction to not harm, threaten, or in any way cause physical injury to Dr. McAuliffe. Jackson was indicted in this case with assault with a deadly weapon. TEX. PENAL CODE ANN. § 22.02 (Vernon 1994). Subsequent to indictment but prior to trial, Jackson was found guilty of contempt of court in Austin and sentenced to 90 days confinement. Jackson has served that sentence. In this case, Jackson filed a pretrial writ of habeas corpus claiming that her prosecution was barred under the Double Jeopardy Clause of the Fifth Amendment and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; Article I, section 14 of the Texas Constitution; and TEX. CODE CRIM. PRO. ANN. arts. 1.04 & 1.10 (Vernon 1977), urging *Ex parte Rhodes*, 974 S.W.2d 735 (Tex.Cr.App.1998). The trial court agreed and granted the writ because the contempt charge and aggravated assault involved the same conduct. The State appeals. We affirm.

Dr. McAuliffe testified that he was working at Harris Hospital in Fort Worth in November 1996 when he received a

message to call a phone number in Austin. Upon returning the call, he spoke to Katherine Sue Jackson, who asked him about a play which had been put on by hospital interns. A week later, Dr. McAuliffe received a letter from Jackson which contained a photograph of her 14–year–old son and implied that he was the child's father. Jackson told him that she would be "discreet" if her money held out. Other letters followed stating that Dr. McAuliffe was the child's father and that he would "end up paying her money."

Dr. McAuliffe had never heard of Jackson before the November phone call. Jackson then took her "case" to the Child Support Division in Austin, where she claimed that Dr. McAuliffe was the father of her son. The Child Support Division sued Dr. McAuliffe in August 1997; but, after he submitted to a DNA test which resulted in a negative finding, the Child Support Division dropped the case.

The day the paternity case was dismissed, October 16, 1997, Jackson showed up in the emergency room where Dr. McAuliffe worked in Fort Worth. Dr. McAuliffe recognized her because she had been sending him photos of her and her son for a year. Within a month or two after Dr. McAuliffe's family moved to Abilene, Jackson began sending letters to his new home. One letter stated that Jackson had gone through the dumpster behind Dr. McAuliffe's former house in Granbury, Texas, and had taken some of the trash. Jackson claimed that she had a DNA sample from the trash that would prove Dr. McAuliffe was the father of her son. Dr. McAuliffe sought an injunction against Jackson based on this behavior because he and his wife were afraid that Jackson would come to their home, where they lived with their five children. The injunction was granted in November 1998.

Prior to the contempt hearing for her violations of the injunction, Jackson sent Dr. McAuliffe invitations to her son's recitals, a St. Patrick's Day card, and real estate listings. When the paternity case was dismissed, Jackson filed a rape charge for civil damages against Dr. McAuliffe in Taylor County in which she claimed that Dr. McAuliffe had raped her in 1981. This case was dismissed. Jackson also filed suit in Federal Court, claiming that Dr. McAuliffe had conspired with another man to have him seduce her after Dr. McAuliffe had had sex with her and that she had become pregnant. Dr. McAuliffe was also accused in this suit of conspiring to keep Jackson unaware of the identity of the true father of her child. Jackson also claimed that Dr. McAuliffe conspired with her OB doctor to give her false information about her delivery dates and to falsify her pregnancy tests. This case was also ultimately dismissed. According to Dr. McAuliffe's testimony, Jackson also filed suit, alleging that Dr. McAuliffe's wife switched his blood test in the DNA lab by using her father's influence as a Texas senator to gain access to the lab. However, Dr. McAuliffe's wife's father died in an oil rig accident when Dr. McAuliffe's wife was a child. In that suit, Jackson sued not only Dr. McAuliffe but also his attorney, his wife, the Attorney General's Office, and the Child Support Division. This case was also dismissed.

Prior to the second contempt hearing, Dr. McAuliffe had filed a motion for contempt based on an earlier violation of the injunction against Jackson. Jackson had sent a letter to Dr. McAuliffe's mother which stated that Jackson's son was her grandson. On October 14, 1999, Jackson was found in contempt of court for violating the temporary injunction by attempting to contact and communicate with Dr. McAuliffe's parents. She was committed to the Travis County Jail for a period of

one week as punishment for this violation. At the contempt hearing involving this incident, Jackson testified that she would not violate the injunction again. In her answer to the motion for contempt for the first violation of the injunction, Jackson restated that she would not violate the injunction again. The second contempt hearing marked Dr. McAuliffe's ninth court appearance due to suits by Jackson. Dr. McAuliffe estimated that Jackson had sent over 100 letters and messages to him and his attorneys. Jackson threatened Dr. McAuliffe and his wife in front of a judge in September 1999 and had to be escorted from the courtroom by a bailiff and several deputies. On November 23, 1998, the 53rd District Court in Travis County issued a temporary injunction against Katherine Sue Sanchez Jackson. Jackson was served with a copy of the order and a writ of injunction on December 1, 1998. The order was extended by the court on December 13, 1999, and Jackson was served with a copy of the extension on December 15, 1999.

On December 17, 1999, Dr. McAuliffe was examining patients in the emergency room in an Abilene hospital. As he walked out of a room, Jackson was standing in the hallway. She said that she wanted to talk to Dr. McAuliffe, but he told her he was not going to talk to her. He then walked with her to the security desk at the front of the entrance to the emergency department; and, as he looked down, he noticed that Jackson had an overcoat draped over her arm. Dr. McAuliffe realized that Jackson had a gun. He asked, "[W]hat do you have there, a gun?" When Jackson started to move her hand in his direction, Dr. McAuliffe reached out, grabbed her arm, and pushed her arm down. Jackson fired the gun. Dr. McAuliffe then swung the gun hitting Jackson on the head, and she fell over. Jackson was then arrested.

The 53rd Judicial District Court of Travis County, Texas, had previously entered a temporary injunction ordering Jackson to refrain from the following acts and conduct:

A. Contacting Plaintiff, Plaintiff's wife, Plaintiff's children and/or any member of Plaintiff's family, in person, by telephone, in writing, by electronic mail, facsimile or any other medium and/or from communicating with Plaintiff, Plaintiff's wife, Plaintiff's children and/or any member of Plaintiff's family in any fashion or by any means;

B. Harassing, harming, threatening or in any way causing physical or emotional injury to Plaintiff, Plaintiff's wife, Plaintiff's children and/or any member of Plaintiff's family; and/or

C. Coming onto Plaintiff's property or coming within 400 yards of Plaintiff's residence or his place of employment.

Based on the December incident, Jackson was found to have violated the injunction and was convicted of criminal contempt. On March 9, 2000, Jackson was sentenced to confinement for 90 days in the Travis County Jail.

Previously, on March 2, 2000, the State had charged Jackson with aggravated assault based on the December incident. The indictment alleged:

[T]hat on or about the 17th day of December, 1999, and anterior to the presentment of this indictment, in the County and State aforesaid [Taylor County] KATHERINE SUE JACKSON did then and there intentionally and knowingly use and exhibit a deadly weapon, to wit: A HANDGUN, and the said KATHERINE SUE JACKSON did then and there intentionally and knowingly threaten MICHAEL MCAU-

LIFFE with imminent bodily injury by the use of said deadly weapon.

Jackson filed a pretrial writ of habeas corpus alleging that, because the indictment constituted a second prosecution for the same offense after her contempt conviction, she was illegally restrained. Double Jeopardy is prohibited under both the United States Constitution [1] and the Texas Constitution.[2]

The specific issue is whether there is protection against a second prosecution for a substantive offense after conviction for criminal contempt involving the same conduct. The United States Supreme Court articulated the test used for double jeopardy analysis in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The *Blockburger* test asks whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution. *Ex parte Busby*, 921 S.W.2d 389 (Tex.App.-Austin 1996, pet'n ref'd).

Jackson, urging that this court apply the case of *Ex parte Rhodes*, 974 S.W.2d 735 (Tex.Cr.App.1998), argues that the criminal contempt order issued by the 53rd Judicial District Court punished her for "knowingly and intentionally threatening plaintiff Michael J. McAuliffe with immediate physical bodily injury by her use and exhibition of a handgun." Jackson points out that that specific finding is identical to the language found in the indictment:

[D]id then and there intentionally and knowingly use and exhibit a deadly weapon, to wit: A HANDGUN, and the said KATHERINE SUE JACKSON did then and there intentionally and knowingly threaten MICHAEL MCAULIFFE with imminent bodily injury by the use of said deadly weapon.

Jackson argues that there is no element in the charging instrument not covered by the court's specific finding in the contempt order. Consequently, the two prosecutions are for the "same offense." We agree.

In *Rhodes*, the court addressed the very issue before us. Rhodes had been enjoined by the court in his divorce from changing the child's county of residence without prior court approval. Rhodes moved his child to Singapore. Upon reentry to the United States, Rhodes was arrested and charged with the criminal offense of interference with custody. TEX. PENAL CODE ANN. § 25.03 (Vernon Supp.2002). The former wife instituted contempt proceedings. Rhodes was held in contempt. Subsequently, Rhodes filed an application for pretrial writ of habeas corpus.

The Texas Court of Criminal Appeals held that, because he had already been prosecuted for contempt of court, Rhodes' subsequent prosecution was barred by the

---

**1.** Amendment V to the United States Constitution provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself; nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**2.** Article I, section 14 of the Texas Constitution provides:

No person, for the same offense, shall be twice put in jeopardy of life or liberty, nor shall a person be again put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction.

Double Jeopardy Clause of the U.S. Constitution. This court is bound by the precedential effect of *Rhodes*.

The court's decision in *Rhodes* was founded upon *U.S. v. Dixon*, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). The *Dixon* Court addressed two companion cases. The facts surrounding Michael Foster's case are more analogous to the facts before us than the facts in Alvin Dixon's case. Based on his alleged physical attack upon her in the past, Foster's estranged wife obtained a civil protection order requiring Foster not to assault or physically abuse his wife. Foster kicked his wife and threw her down some stairs, causing physical injury. Foster was found guilty of criminal contempt and sentenced to imprisonment. Subsequently, Foster was indicted for the criminal act. Foster filed a motion to dismiss the indictment, claiming a double jeopardy bar. A majority of the Supreme Court concluded that one count of Foster's indictment should be dismissed on double jeopardy grounds.

Judge Price, writing for the majority in *Rhodes*, noted that *Dixon* was a plurality opinion and undertook to analyze each of the justices' opinions in *U.S. v. Dixon*, supra. Judge Price does an excellent job of analyzing each member of the *Dixon* Court's position to determine the precedential effect of *Dixon*. By mathematically tallying each opinion from *Dixon*, Judge Price and the court held that Rhodes's subsequent prosecution, having been prosecuted for contempt of court, was barred by the Double Jeopardy Clause.

However, *Dixon* is a plurality opinion. A plurality opinion is not authority for determination of other cases. The Precedential Value of Supreme Court Plurality Decisions, 80 COLUM. L. REV. 756 (1987). A plurality opinion should be read only on the narrowest grounds upon which the judges agree. We understand *Dixon*

to overrule an additional "same-conduct" review for determination of double jeopardy as in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), and to reaffirm the *Blockburger* test as the test for double jeopardy. Although its reasoning may be persuasive, *Dixon* is not precedential on the issue before us.

In his opinion in *Dixon*, Chief Justice Rehnquist states:

> In fact, every Federal Court of Appeals and state court of last resort to consider the issue before *Grady* agreed that there is no double jeopardy bar to successive prosecutions for criminal contempt and substantive criminal offenses based on the same conduct.

*U.S. v. Dixon*, supra at 715, 113 S.Ct. 2849.

We believe that the proper analysis of the issue before us was addressed in *Ex parte Williams*, 799 S.W.2d 304 (Tex.Cr. App.1990). In *Williams*, decided prior to *Dixon*, the court addressed the applicability of a *Blockburger* analysis to a determination of whether a conviction for criminal contempt for violating an order entered in civil proceedings would bar criminal prosecution for offenses based on the same acts which established violation of the civil order. In *Williams*, the court entered temporary orders restraining Williams from causing or threatening to cause bodily injury to his neighbors. Williams shot and injured two of his neighbors. Williams was found in contempt and assessed a 30–day jail sentence. Subsequent to the hearing but prior to the entry of the contempt order, Williams was indicted for attempted capital murder. The court held that these were not the "same offense" and that the jeopardy provisions protected only against prosecutions by persons on behalf of the same sovereign. In *Williams*, the contempt conviction, while "criminal" in nature, was not the "same offense" as the attempted capital murders that the State

was then seeking to prosecute. The court said that whether the crimes would pass a *Blockburger* analysis was not relevant.

Because we are bound by the holding in *Rhodes*, we affirm the judgment of the trial court. However, because *Rhodes* is based on *Dixon*, a plurality opinion, we respectfully suggest that the court reexamine its position in *Rhodes* and *Williams*.